# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JAMES LONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:13-cv-176-MHT-PWG** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **HUMAN RESOURCES, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This employment discrimination and "whistleblower" case is before the court on two motions for summary judgment: (1) a motion for summary judgment by Defendants the Alabama Department of Human Resources (hereafter "ADHR"), Nancy Buckner, Commissioner of ADHR, in her official and individual capacities, and Sharon E. Ficquette, Esq., General Counsel or Chief Legal Counsel[1] for ADHR, in her official and individual capacities, as to all claims asserted against them by Plaintiff, Mr. James Long, Esq. (Doc. 27); and (2) a motion for summary judgment

---

[1] Throughout the documents of record on the motions for summary judgment, the parties and evidence refer to Sharon Ficquette as holding the position of "General Counsel" and "Chief Legal Counsel" for ADHR. These appear to be different titles for the same job position as the terms "General Counsel" and "Chief Legal Counsel" are used interchangeably. Ms. Ficquette will be referred to as "Chief Legal Counsel" for purposes of this recommendation.

by Mr. Long as to his claim asserted against Commissioner Buckner and Ms. Ficquette, in their individual and official capacities, pursuant to the Alabama State Employees Protection Act ("ASEPA"), Ala. Code § 36-26A-1, *et seq*. (Doc. 25).

In his Amended Complaint, Mr. Long asserts the following legal claims against Commissioner Buckner and Ms. Ficquette, in their respective individual and official capacities, and ADHR: race discrimination based on adverse disciplinary actions and termination from employment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1866, 42 U.S.C. § 1981, through the remedial vehicle of 42 U.S.C. § 1983 (Count I); retaliation under Title VII and § 1981 based on adverse disciplinary actions and termination from employment (Count II);[2] and a § 1983 claim for First Amendment retaliation (Count

---

[2] Mr. Long undoubtedly alleges Title VII and § 1981 disparate treatment and retaliatory discipline claims in his Amended Complaint; however, Defendants correctly point out in their reply brief that, to the extent those claims are based on discipline other than termination, he neglects to defend or support those claims on summary judgment. (Doc. 45 at pp. 5-6). In his brief in response to Defendants' motion for summary judgment, Mr. Long does not make any argument or point to specific evidence in support of his race discrimination and retaliatory discipline claims. Rather, Mr. Long solely argues that he should have faced less severe discipline than termination. (Doc. 39 at pp. 85-87). That argument speaks to a discriminatory or retaliatory termination claim, not a discipline claim. Moreover, after Defendants raised the abandonment issue, Mr. Long did not file a motion seeking leave to file a surreply or other brief to argue against abandonment or to otherwise attempt to preserve his discipline based disparate treatment and retaliation claims. Because Mr. Long failed to raise or defend his adverse discipline claims on summary judgment, to the extent that his § 1981 and Title VII claims are based on adverse employment actions other than termination, those claims are properly treated as having been abandoned. *See, e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (a claim may be

IV). (Doc. 12). He also brings a claim for violation of the ASEPA against Commissioner Buckner and Ms. Ficquette in their official and individual capacities (Count III). (Doc. 12). Mr. Long alleges to have "suffered embarrassment, humiliation, shame, damage to reputation, mental distress, emotional and physical pain and anguish, and lost wages" because of the Defendants. (Doc. 12 at p. 20). As to each claim, Mr. Long seeks reinstatement to his former job, restoration of seniority and benefits, a spectrum of monetary damages, injunctive relief, declaratory relief, and attorneys' fees and costs. Defendants, in addition to denying the merits and

---

considered abandoned when the district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

Conceivably, viewing the evidence in a light most favorable to Mr. Long, he could have made an argument that is not found in his briefing on summary judgment, *i.e.*, that a November 2011 memorandum of instruction or a December 2011 written reprimand directed to him support his discriminatory or retaliatory discipline claims. That possible argument would not have saved Mr. Long's discipline claims on their merits. Assuming without deciding that Mr. Long could make out a *prima facie* claim of disparate treatment or retaliation based on those two instances of disciplinary action, there is undisputed evidence (discussed *infra*) that Defendants had legitimate, nondiscriminatory or non-retaliatory reasons for both instances of workplace discipline. When viewing the evidence of record in a light most favorable to Mr. Long, he cannot meet his burden to show pretext in either of those instances.

Moreover, the memorandum of instruction and reprimand are immaterial to Mr. Long's Title VII and § 1981 termination claims. The undisputed evidence is that the two instances of discipline did not cause the more severe penalty of termination to be at applicable where it otherwise would not have been but-for those two instances of discipline. In other words, each charge ADHR levied against Mr. Long when seeking his termination involved conduct for which termination on the first instance, without any consideration of prior discipline, is permissible under the applicable personnel rules or policies in this case.

factual basis of all claims, assert the defenses of immunity from suit pursuant to the Eleventh Amendment of the U.S. Constitution and qualified immunity, to the extent they are applicable to each Defendant.

The court has subject matter jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (equal rights), and § 1367 (supplemental jurisdiction). The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

Mr. Long does not move for summary judgment on his federal claims, and all parties oppose their respective adverse party's motion for summary judgment. Extensive briefs and evidentiary submissions are part of the court's record. The motions are ripe for review. Upon consideration, and for the reasons discussed herein, the undersigned Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and Defendants' motion for summary judgment be **GRANTED**.

## I.     BACKGROUND AND STATEMENT OF RELEVANT FACTS[3]

### A.     Background

This lawsuit is based on a large body of evidence and implicates material and immaterial events that date back to the turn of this century.  The legal issues are relatively straightforward; however, the facts of this case mandate an extensive explanation.

### B.     The Defendants

Defendant ADHR, formerly the State Department of Pensions and Securities, is a division of the State of Alabama and is headquartered in Montgomery, Alabama. (Doc. 36-2 at p. 26; Code of Alabama § 38-2-1 (1975)).  The mission of the ADHR is to provide assistance to Alabamians on a wide range of issues including

> assisting with child support (establishment, enforcement, collections); administering family financial assistance programs; administering the subsidized child care program and the regulating and licensing of child care service providers; administering the child welfare programs; and administering the Supplemental Nutrition Assistance Program.

(Doc. 28 at p. 4; Doc. 29-1 at ¶ 3; Code of Alabama § 38-2-6 (1975)).

Approximately 4,100 people work for ADHR in offices located throughout

---

[3] These are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted).  Indeed, the parties make arguments assuming the facts of this case for summary judgment purposes only.

Alabama.  (Doc. 37-11 at p. 51). As a division of the State of Alabama, ADHR has employees who serve as "merit" or "classified" employees as well as people who are employed outside of the merit system.

The Commissioner of the State Department of Human Resources is the highest ranking position within ADHR, and that officer reports directly to the governor. (Alabama Code § 38-2-3(a) (1975)).  Commissioner Buckner serves in that role. (Doc. 29-1 at ¶ 5).  Among her other job duties, the Commissioner is vested with hiring, firing, and disciplinary authority over ADHR employees.  (Doc. 29-1 at ¶ 7).

For the purposes of defending and prosecuting civil and criminal cases and providing legal assistance on its behalf, ADHR employs thirty-eight attorneys in its Legal Office to act as in-house counsel for its various departments.  (Doc. 29-2 at ¶ 4).  Those attorneys represent ADHR as their client.  (Doc. 29-2 at ¶¶ 6-7).  The Legal Office is headquartered in Montgomery, Alabama.  (Doc. 29-2 at ¶ 5).  There are six branch offices located in Montgomery, Mobile, Baldwin County, Calhoun County, Jefferson County, and Tuscaloosa County.  (Doc. 29-2 at ¶ 5).

The Chief Legal Counsel is the highest officer within the Legal Office and reports directly to the Commissioner.  Since April 2005, Ms. Ficquette has been the Chief Legal Counsel for ADHR.  (Doc. 29-2 at ¶ 3).

## C.     ADHR's Personnel Department and Performance Appraisals

The Personnel Division of ADHR provides services and support to ADHR and its employees pursuant to state law, the Rules of the State Personnel Board, and ADHR's policy manual.  (Doc. 29-1 at ¶ 8).  The Personnel Division provides services in areas including hiring, promotion, retirement, termination, pay, and performance appraisals.  (Doc. 29-1 at ¶ 8).

ADHR has policies which mandate that periodic performance appraisals be conducted of merit system employees.  The performance appraisal is a written document detailing a supervisor's evaluation of the rated employee's performance. A performance appraisal must be signed by the employee, the "rating supervisor," and the "reviewing supervisor" in order to be considered complete.  (Doc. 29-10 at ¶ 6).

Pursuant to ADHR policy, the rating supervisor and the reviewing supervisor are required to meet and confer regarding the content of a performance appraisal before the employee is evaluated by the rating supervisor.  (Doc. 29-10 at ¶ 6).  The procedure is as follows: (1) the rating supervisor and reviewing supervisor confer about a performance appraisal; (2) the rating supervisor and employee meet for a performance evaluation and to discuss the performance appraisal; (3) the rating supervisor and employee sign the performance appraisal; (4) the reviewing supervisor signs the performance appraisal; and (5) when completed, the performance appraisal

7

must be returned to the ADHR Personnel Division where a copy will be maintained in the reviewed employee's personnel file.  (Doc. 29-10 at ¶ 6).

A part of the performance appraisal is a numerical rating system of an employee.  A set of "points" are either awarded for positive action or deducted for disciplinary infractions.  Pursuant to ADHR policy, "an employee who receives a written reprimand for conduct during a rating period should have a mandatory point deduction on the appraisal for the rating period in which the conduct occurred." (Doc. 29-10 at ¶ 10).  That said, it is consistent with ADHR policy to deduct points from an employee's performance appraisal "if the employee received disciplinary action after the rating period for conduct that occurred during the rating period the mandatory point reduction would be deducted on the delinquent appraisal due to the infraction occurring within that rating period."  (Doc. 29-10 at ¶ 10).

### D.    Mr. Long's Employment History at ADHR

Mr. Long was admitted to practice law in the State of Alabama in 1979.  (Doc. 29-3 at p. 7).  His first job was with Legal Services of Alabama from 1979-1983. (Doc. 29-3 at p. 7).  On July 6, 1983, he began his career as an attorney for ADHR as a merit system employee at the rank of Attorney I.[4]  (Doc. 12 at ¶ 10; Doc. 13 at ¶ 10;

---

[4] Under the Alabama merit system, attorneys can presently hold the rank of Attorney I/II, Attorney III, or Attorney IV.  Attorney I/II is an entry level position.  When Mr. Long started working for ADHR, Attorney I and Attorney II were separate merit system ranks.  As to attorneys

Doc. 29-3 at p. 8).  In September 1984, Mr. Long was promoted to Attorney II. (Doc. 29-3 at p. 8, 25-26).  Mr. Long was further promoted to Attorney III in April 1987, and that was the highest merit system rank he held while employed with ADHR. (*Id.* at p. 9).  In his capacity as an attorney for ADHR, among many other duties, Mr. Long represented ADHR in employment discrimination cases.  (Doc. 36-2 at p. 57).

In either 2004 or 2005, Mr. Long applied for and was offered the rank of Attorney IV and the position of ADHR Chief Legal Counsel.  (Doc. 29-3 at pp. 9-10). At that time, Mr. Long and Ms. Ficquette were competing for the same promotion. (Doc. 29-3 at pp. 9-10).  Mr. Long testified that he declined the promotion when it was offered to him by the ADHR Commissioner.  (Doc. 29-3 at pp. 9-10). After he turned down the promotion, Ms. Ficquette became Chief Legal Counsel and Mr. Long's direct supervisor in April 2005.  (Doc. 29-3 at pp. 9-10; Doc. 29-2 at ¶ 3). Mr. Long did not have "any problems getting along with Ms. Ficquette" prior to her ascension to the Chief Legal Counsel position nor did he take issue with accepting her as his supervisor.  (Doc. 29-3 at p. 10).  Moreover, Mr. Long does not contend that Ms. Ficquette ever evaluated his work in a performance appraisal "unfairly."

---

working in ADHR, Mr. Long stated at his deposition that the only attorney who holds the Attorney IV rank is the Chief Legal Counsel. (Doc. 29-3 at p. 9).  The parties do not assert nor is there evidence of record referenced by the parties to suggest that any ADHR employee other than the occupant of the ADHR Chief Legal Counsel position holds the Attorney IV classification.

(Doc. 29-3 at p. 11).  Although she was Mr. Long's direct supervisor, Ms. Ficquette did not have the authority to unilaterally terminate Mr. Long's employment.  (Doc. 29-2 at ¶ 8).

After declining the promotion to Chief Legal Counsel, Mr. Long unsuccessfully sought promotion to Attorney IV.  (Doc. 29-3 at p. 11).  Although he was not promoted to the Attorney IV classification, Mr. Long did receive a substantial promotion outside of the merit system approximately a year after Ms. Ficquette became Chief Legal Counsel.  By a letter dated April 6, 2006, Mr. Long was promoted to the position of Deputy Attorney General by then Attorney General Troy King.  (Doc. 29-3 at pp.10-11).  Mr. Long had previously submitted a written application for the position.  (Doc. 36-2 at p. 28).  By law, ADHR is permitted only one Deputy Attorney General at a time.  (*See* Ala. Code § 36-15-5.1(b)).  The Deputy Attorney General at ADHR is the second highest ranking attorney within the department.  (Doc. 37-11 at pp. 64-65).

The position of Deputy Attorney General is not a merit system position and he or she serves at the pleasure of the Attorney General.[5]  (Doc. 29-3 at pp. 10-11; Ala.

---

[5] In the first of his three depositions of record, Mr. Long testified that he wanted to be a Deputy Attorney General.  (Doc. 36-2 at p. 28).  He further testified under oath that he understood that a Deputy Attorney General was an unclassified, at-will employee who served at the pleasure of the Attorney General.  (Doc. 36-2 at p. 29).  Under Alabama law, "one who desires to serve in an official capacity must submit to the orders and regulations under which he is admitted to service." *Simpson v. Van Ryzin*, 265 So. 2d 569, 573 (Ala. 1972).  By accepting the unclassified Deputy

Code §§ 36-15-5.1(c), (e)). Mr. Long received a pay raise when he was promoted to Deputy Attorney General.  (Doc. 29-3 at pp. 10-11).  As Deputy Attorney General, in addition to his duties as an in-house lawyer, Mr. Long supervised certain ADHR employees and was responsible for conducting performance appraisals as the rating supervisor of those employees.  (Doc. 36-2 at p. 30).  Ms. Ficquette was the reviewing supervisor over the employees who were subordinate to Mr. Long.  (Doc. 36-2 at p. 30).  Ms. Ficquette remained Mr. Long's direct supervisor.  (Doc. 29-3 at pp. 10-11).

Mr. Long was a Deputy Attorney General at ADHR until his involuntary termination from employment on April 20, 2012.  (Doc. 29-11 at ¶ 9; Doc. 36-1 at p. 2).  At the time of his termination, ADHR "had the authority to revert Mr. Long to his merit system Attorney III position and pay his terminal annual leave at a lower rate. [ADHR], however, chose to separate Mr. Long from his unclassified Deputy Attorney General position and pay the terminal leave at the higher rate."  (Doc. 36-1 at p. 2). The State of Alabama Personnel Department noted in a letter to Mr. Long's personnel file that the record of his employment "should reflect both an involuntary separation from his unclassified position as well as a dismissal from his merit system position." (Doc. 36-1 at p. 1).

---

Attorney General position, Mr. Long submitted himself to the benefits and the detractions that accompany an unclassified employment position in the State of Alabama.

Before Commissioner Buckner made the final decision to terminate Mr. Long's employment, Mr. Long requested that he be allowed to retire in lieu of termination and that his personnel records indicate that he was eligible for rehire; however, Commissioner Buckner decided that terminating Mr. Long's employment was appropriate. (Doc. 36-11 at p. 126).

Despite his termination from employment, Mr. Long is retired from public service and he receives retirement benefits based on his last highest rate of pay at the Deputy Attorney General level, which is undisputedly higher than the merit system Attorney III pay rate. (Doc. 29-3 at p. 59; Doc. 36-1 at p. 2).

**E.    ADHR Hires Attorneys After Terminating Mr. Long's Employment**

The Deputy Attorney General who was promoted following Mr. Long's termination is a black female. (Doc. 29-10 at ¶ 9 and Ex. B thereto). The first Attorney III who was added to the ADHR state-wide Legal Office after Mr. Long's termination is a white female who was appointed and stationed in the ADHR branch office located in Calhoun County, Alabama.[6] (Doc. 29-10 at ¶ 11; Doc. 36-11 at pp. 24-25). Unlike Mr. Long, that attorney never held the office of Deputy Attorney General. (Doc. 29-10 at ¶ 11).

---

[6] Approximately two months after her promotion to Attorney III, the attorney was relocated to an office in Montgomery, Alabama. (Doc. 36-11 at pp. 23-24).

## F.    The Office of Criminal History Checks

In order to understand the context of Mr. Long's claims, the applicable starting point is the year 2000.[7]   Alabama law requires that a criminal history background information check be performed on all persons who have a license or who work in a licensed child care or adult care facility, an ADHR sanctioned foster or adoptive home, or a licensed child placing agency.  (Doc. 29-2 at ¶ 14).  Mr. Long wrote the criminal background check law in 2000.  (Doc. 36-2 at p. 32).  When the law went into effect, ADHR created a department that became known as the Office of Criminal History Checks ("CHC") to manage ADHR's responsibilities under the law.  Mr. Long established and supervised the CHC from its inception in 2001 until he was removed by ADHR as the CHC supervisor in February 2009.  (Doc. 36-2 at pp. 31-

---

[7] Mr. Long's counsel, Mr. L. William Smith, Esq., made the following statement for the record at his client's May 2014 deposition: "This lawsuit is about protected activity that happened in 2011 and 2012[.]" (Doc. 29-3 at p. 52).  Mr. Smith conceded to defense counsel that there was no "statutory problem" (presumably related to Mr. Long's Title VII and § 1981 claims) at issue in this case.  (*Id.*).  Defendants' attorney accepted Mr. Smith's representations and indicated that she would cease asking Mr. Long questions speaking to those issues.  In Defendants' motion for summary judgment, Defendants rely on Mr. Smith's statement for the proposition that Mr. Long cannot show retaliation in this lawsuit because of any protected activity that occurred in 2009.  (Doc. 28 at p. 51 n.28).  Mr. Long does not challenge that statement in his briefing on the instant motions, and Defendants are correct in their argument that the "applicable statute of limitations (§ 1981) and the applicable administrative exhaustion requirements (Title VII) bar such claims." (Doc. 28 at p. 51 n.28).  That said, it would be difficult for an uninitiated reader of this opinion to understand the context of the alleged protected activity in 2011-2012 without background information beginning over a decade prior to that time.  The Magistrate Judge does not recommend a ruling on or provide a basis for reanimating claims that are not at issue in this litigation and discusses pre-2011 events only to frame the relevant matters for summary judgment.

32).

The actual criminal history checks are performed by either or both the Federal Bureau of Investigation or the Alabama Bureau of Investigation in conjunction with the Alabama Department of Public Safety. (Doc. 29-2 at ¶ 14; Doc. 36-2 at pp. 33, 78). The Department of Public Safety bills the CHC a fee for performing the checks. (Doc. 29-2 at ¶ 14; Doc. 36-2 at pp. 33, 78). The CHC maintains the records of the results of criminal history checks, and uses the results for ADHR's purposes and to make recommendations to other state agencies and licensing bureaus. Those records include Reports of Arrest and Prosecution ("RAP sheets"). Pursuant to ADHR policy and Alabama law, RAP sheets are designated as confidential, must be maintained or stored under very specific, secure circumstances (*i.e.*, in a locked cabinet within a locked office), and cannot be disclosed to unauthorized third parties. (Doc. 26-8 at p. 5, citing Alabama Code § 38-13-8(a) (1975) and ADHR Office of Criminal History Policy 5.3; Doc. 29-26 at pp. 8-12).

On March 24, 2003, Mr. Long hired Ms. Carolyn Rawls, Esq., a black female, to be the manager of the CHC. (Doc. 36-2 at pp. 43-44). Ms. Rawls holds a law degree from Thomas Goode Jones School of Law in Montgomery, Alabama. She is not a practicing attorney, however, and has never been licensed to practice law in any state. (Doc. 36-3 at pp. 124, 296-297). Mr. Long was Ms. Rawls's rating supervisor

during her tenure at CHC. (Doc. 36-2 at p. 44).  Ms. Ficquette was the reviewing official over Ms. Rawls's performance appraisals.  (Doc. 36-2 at p. 44).

Ms. Rawls's term as manager of the CHC did not end well for her or for Mr. Long. Because of what ADHR determined to be long-running problems within the CHC, ADHR removed Mr. Long and Ms. Rawls from their roles at CHC and issued written reprimands to each of them on February 11, 2009.  Mr. Long was removed as the supervisor over CHC, but he remained employed as a Deputy Attorney General with ADHR.  (Doc. 36-11 at pp. 31-33).  Ms. Rawls was transferred to another department on that same date, and she resigned her employment effective March 31, 2009.  (Doc. 36-11 at pp. 31-33).  Both Mr. Long and Ms. Rawls were replaced in their CHC roles with white employees of ADHR.  (Doc. 36-11 at pp. 31-32).

G.    The *Rawls* Litigation

Because of events leading up to and including their removal from their posts at the CHC, Mr. Long and Ms. Rawls concluded that they were discriminated against on the basis their race by ADHR, Ms. Ficquette, and Commissioner Buckner.  They filed charges with the EEOC, and Ms. Rawls later filed a civil lawsuit in this court on January 3, 2011.  (*See Rawls v. State of Alabama Department of Human Resources*, Case No. 2:11-cv-00059-MHT-TFM).

The events leading to Ms. Rawls's and Mr. Long's removal from their

supervisory roles at CHC have previously been set out by this court in *Rawls* as follows:

> Rawls was at the center of a protracted disagreement between the Office of Criminal History Checks and the Department of Public Safety over unpaid invoices for background checks. Since at least 2006, the two entities struggled to develop a coordinated electronic system for tracking invoices and payments between them. Public Safety implemented a software program that failed to rectify the situation; Human Resources also attempted to design a program to handle the invoices. Neither entity had successfully put in place a system by the fall 2008.

> In October 2008, the Alabama Board of Adjustment—an agency charged with hearing monetary claims against the State—became involved in the ongoing dispute and served as a mediator between the Human Resources and Public Safety Departments. In this role, the board sought to reconcile the budgets of the two departments by sending Public Safety's pending claims to Human Resources and determining whether and how much Human Resources had paid already.

> On October 20, 2008, the Adjustment Board sent a claim to Human Resources attorney Elizabeth Hendrix (black), who worked in the department's Legal Office and was tasked with resolving this dispute. In Claim # 2009–0048, Public Safety sought a $217,055 payment for 12 past-due invoices for background checks provided to the Criminal History Checks Office. Claim # 2009–0048 covered invoices from October 2007 to June 2008.

> On November 4, 2008, Hendrix sent Rawls a memo alerting her to Claim # 2009–0048. The memo instructed Rawls to review the claim and recommend appropriate action, such as making a payment to Public Safety, denying a payment, or requesting additional information. Rawls did not immediately respond to Hendrix.

> Instead, on November 25, 2008, Rawls sent an email to Long, her

immediate supervisor. Rawls's email contained a chart with entries for every month between October 2007 and September 2008. The chart had columns for invoices from Public Safety, bills from Human Resources, net savings, and percentage paid. That same day, Long forwarded Rawls's email to Hendrix, commenting that the "inability of the Department of Public Safety and [the Human Resources Department] to reconcile bills has been a problem for years." Chart Email (Doc. No. 38–1) at 19. According to Hendrix, Rawls's chart was not "immediately useful to me in responding to [the Adjustment Board]" because it did not address the specific unpaid invoices in Claim # 2009–0048. Hendrix Affidavit (Doc. No. 38–1) at 5.

On December 3, 2008, Hendrix received a second claim from the Board of Adjustment. In Claim # 2009–0178, Public Safety sought a $78,201.50 payment for three past-due invoices for background checks conducted between July 2008 and September 2008. On January 7, 2009, Hendrix sent the second claim to Rawls and asked for a response.

On January 14, 2009, Long sent Ficquette and Human Resources Commissioner Nancy Buckner (white) an email detailing staff discord at the Criminal History Checks Office; Rawls was copied on this email. According to Long, "[Criminal History Checks Office] staff are complaining and feeling very much unappreciated by management" despite numerous new electronic programs that had just been implemented. Long Email (Doc. No. 49–1) at 31. Long approvingly mentioned that Rawls was doing the best she could to keep office staff motivated.

On January 16, 2009, Hendrix sent another email to Rawls demanding a response to Claim # 2009–0048 and Claim # 2009–0178. On January 26, Rawls replied to Hendrix by saying that Human Resources had made "partial payments" to Public Safety for fiscal year 2008. Rawls also explained that Human Resources had built a new software program to review the invoices for fiscal year 2009. Rawls–Hendrix Email (Doc. No. 38–1) at 32. Next, on January 29, 2009, Rawls copied Hendrix on an email where she stated that she had just completed working through the October 2007 invoices and that Public

Safety would be owed an unspecified additional payment. And, on January 30, 2009, Rawls responded to the second Adjustment Board claim and sent Hendrix an email with the same chart that she had previously sent to Long.

Tensions reached a tipping point in early February. On February 2, 2009, Rawls emailed Patricia Evans, a Public Safety employee, about the October 2007 invoice reconciliation. Rawls informed Evans that the department "will be eligible for an additional $8,330.00 payment via [the Board of Adjustment] for 10–2007 after the [board] hearing is held." Rawls–Evans Email (Doc. No. 38–1) at 44. According to Hendrix, Rawls never received prior authorization to tell Public Safety that Human Resources would pay $8,330 for the October invoice.

Also, on February 2, 2009, Paul Lista, a Human Resources administrative assistant, sent Rawls an email and copied Hendrix, stating that he had received a phone call from Judy Earnest, an employee at the Alabama Finance Department who handled Adjustment Board work. Lista related that Earnest had expressed concern that Human Resources was attempting to circumvent the Board of Adjustment process.

Early in the morning on February 4, 2009, Evans called Hendrix to discuss Rawls's promise. Lista then forwarded Hendrix the email in which Rawls promised Evans the $8,330 payment.

\* \* \*

On February 11, 2009, Ficquette issued a reprimand to Rawls. Ficquette's reprimand noted that the Office of Criminal History Checks's process for reconciling bills from Public Safety was "burdensome, cumbersome, and far too time consuming." Reprimand (Doc. No. 47) at 8. The reprimand initially focused on Rawls's failure to respond promptly and adequately to Hendrix's memos concerning the two Adjustment Board claims. The reprimand further criticized Rawls for "expect[ing] Public Safety to develop a system for our tracking of what we paid" and for failing to develop an internal means of tracking clearances and paying pills due Public Safety. Id. at 9. Ficquette emphasized Rawls's $8,330 promise to Evans, stating that it was "an

18

unauthorized promise to pay, binding the Department." Id. Ficquette recounted how this promise angered Evans and other Public Safety staff, caused a Public Safety supervisor to question Rawls's and the Human Resources Department's leadership, and exacerbated tensions between the two departments. Next, the reprimand detailed the Human Resources Department's interactions with Lista and the fact that Rawls's behavior had led others outside the department to conclude that Human Resources was "seemingly circumventing the [Board of Adjustment] process." *Id.* at 10.

The reprimand concluded with a list of the ways Rawls violated state personnel rules.

\* \* \*

As a result of the reprimand, Rawls was removed from her position as Office of Criminal History Checks Program Manager. She was replaced by Tommy Crabtree (white), who became acting manager/director of the office effective February 11, 2009. Buckner also moved the office out of the Human Resources Legal Office and placed it under the supervision of Human Resources Chief of Staff Nancy Jinright. According to both Crabtree and Jinright, Crabtree did not seek the Criminal History Checks Office job and, in fact, voiced disappointment in his new position. Rawls's supervisor, Long, was also reprimanded.

*Rawls v. Alabama Dep't of Human Resources*, 2012 WL 1319495, at \*\*1-4 (M.D. Ala. April 17, 2012). Myron H. Thompson, United States District Judge for the Middle District of Alabama, granted summary judgement in favor of ADHR in *Rawls* and concluded that Ms. Rawls had not been subjected to legally cognizable race discrimination. *See Rawls*, 2012 WL 1319495, at \*6, *aff'd Rawls v. Alabama Dep't of Human Resources*, 507 Fed. Appx. 895 (11th Cir. Feb. 11, 2013).

### H.    Mr. Long's Advice to Ms. Rawls About Race Discrimination

While he served as a senior level attorney for ADHR, beginning in either 2005 or 2006 (three to four years before Ms. Rawls and Mr. Long reported that ADHR discriminated against them on the basis of race) and continuing until sometime in 2009, Mr. Long told Ms. Rawls multiple times that he had "confidential information" that would help her prove that Ms. Ficquette and Commissioner Buckner discriminated against her on the basis of her race. (Doc. 36-3 at pp. 119-126). To put Mr. Long's statements to Ms. Rawls in temporal context, Mr. Long began telling Ms. Rawls that he had "confidential information" that she suffered race discrimination by Commissioner Buckner and Ms. Ficquette at approximately the same time CHC and the Department of Public Safety began developing a system of reconciling invoices in 2006. These statements predated Ms. Rawls's reprimands and her ultimate removal as manager of CHC by several years, not merely months or weeks or days. Despite Mr. Long's suspicions or concerns about race discrimination within ADHR, there is no evidence that either Mr. Long or Ms. Rawls reported alleged race discrimination by the Defendants until after they were removed from their roles in the CHC.

### I.    Mr. Long's Performance Appraisal of Ms. Rawls

In ADHR's February 11, 2009 reprimand of Ms. Rawls that removed her from

CHC, Ms. Ficquette determined that Ms. Rawls would receive a seven point disciplinary deduction from her next written performance appraisal.  Mr. Long disagreed with Ms. Ficquette, and he considered Ms. Rawls's performance as manager of CHC to be "outstanding."  (Doc. 36-2 at pp. 146-147).  A week after the reprimand, Mr. Long gave Ms. Rawls a performance appraisal in which he did not deduct the mandatory seven points.[8]  Before the instance involving Ms. Rawls, Mr. Long had never failed to recognize a mandatory point deduction on the performance appraisal of any other employee under his supervision.  (Doc. 36-2 at p. 121).

Mr. Long did not inform Ms. Ficquette in advance or confer with her regarding his February 2009 performance appraisal of Ms. Rawls.  He seemingly unintentionally circumvented Ms. Ficquette's involvement in evaluating Ms. Rawls's performance by routing the performance appraisal away from her office and directly to the Personnel Division. Mr. Long testified that he "almost never" gave completed performance appraisals directly to Ms. Ficquette, the reviewing supervisor, but that it was his understanding the appraisals would be given to Ms. Ficquette by "whoever" received the document from him.  (Doc. 36-2 at pp. 121-125).

Specifically, after Ms. Ficquette determined that Ms. Rawls should receive the

---

[8] As noted *supra*, a rating supervisor does not have discretion to alter the judgment or discipline imposed by a reviewing supervisor.

seven point deduction on her performance appraisal, Mr. Long refused to give effect to that disciplinary action because "he did not agree" with it and because he believed the reprimand was "illegal ... discrimination" under Title VII. (Doc. 36-2 at pp. 116-120). Mr. Long opined that if he deducted the seven points, he would be committing an illegal act. (Doc. 36-2 at pp. 206-208).

Moreover, Mr. Long believed that the reprimand and the seven point deduction did not fall within the applicable time frame for Ms. Rawls's performance appraisal and, therefore, the point deduction was not required on that performance appraisal. The reprimand was issued in February 2009 and, according to Mr. Long, he thought that the performance appraisal only covered reprimands actually issued during the period between January 1, 2008 - January 1, 2009. (Doc. 36-0-2 at p. 211). His understanding on that point, however, is contrary to ADHR's policy that requires a performance appraisal to note discipline that is imposed after a ratings period for events that occurred within the ratings period.

Mr. Long and Ms. Rawls signed the performance appraisal at issue on February 18, 2009. (Doc. 36-2 at p. 212). He did not tell anyone at ADHR or write on the performance appraisal that he was refusing to deduct the seven points because he believed it was illegal and in furtherance of an unlawful act. (Doc. 36-2 at pp. 127, 209-210). Mr. Long contends that he did not violate personnel rules by failing to note

the point deduction on Ms. Rawls's performance appraisal, and he thought he acted as a good supervisor by substituting his judgment for that of ADHR with respect to the seven point penalty. (Doc. 36-2 at p. 119). The performance appraisal was, by his own admission, not a valid appraisal because it did not contain Ms. Ficquette's signature. (Doc. 36-2 at p. 126).

Mr. Long ultimately reported his opinion to his superiors that ADHR acted unlawfully when disciplining Ms. Rawls in a written response to a February 11, 2009 reprimand he received from Ms. Ficquette about his role in the CHC, and he assumed his report "went up the chain." (Doc. 36-2 at p. 120). He also filed the aforementioned EEOC charge in early-2009.

### J.    Mr. Long's and Ms. Rawls's Trip to the EEOC

On March 31, 2009, Mr. Long drove Ms. Rawls from Montgomery, Alabama, to the EEOC office in Birmingham, Alabama, so that each could meet with EEOC Investigator Glenn Todd to discuss their respective charges against ADHR and so that Ms. Rawls could amend her EEOC charge. (Doc. 36-3 at pp. 155-157). While at the EEOC, Mr. Long spoke with Investigator Todd about his charge and Ms. Rawls's charge against ADHR. (Doc. 36-3 at pp. 157-158).

### K.    Mr. Long Gave Ms. Rawls Information and Legal Advice

Mr. Long supplied Ms. Rawls with information to help her identify people who

she asserted were similarly situated comparitors in her lawsuit against ADHR. (Doc. 36-3 at pp. 159-161). He told Ms. Rawls about others who worked in the legal department of ADHR who he believed had been discriminated against on the basis of their race by Ms. Ficquette. (Doc. 36-3 at pp. 200-202). Ms. Rawls used that information in her lawsuit against ADHR. (Doc. 36-3 at pp. 200-202).

While working as a Deputy Attorney General for ADHR, Mr. Long gave Ms. Rawls legal advice that was adverse to ADHR. Mr. Long explained to Ms. Rawls that, in his opinion, her transfer in February 2009 from CHC to Quality Control would be considered a demotion under federal law. (Doc. 36-3 at pp. 242-243). She testified to that advice in her lawsuit against ADHR. (Doc. 36-3 at pp. 242-243).

In February 2009, Mr. Long provided "a packet" of documents to the EEOC in support of Ms. Rawls's charge of discrimination against ADHR. (Doc. 36-2 at pp. 124-125). At some point, Mr. Long dropped his claims against ADHR related to the CHC and the February 11, 2009 reprimand.[9]

Between mid-2009 and January 2012, Mr. Long did not assist Ms. Rawls with her claims against ADHR. Within that time, other relevant events occurred.

---

[9] Mr. Long testified that the EEOC charge he filed at or about the same time Ms. Rawls filed her charge was "a little issue" that he decided not to pursue. (Doc. 36-2 at p. 138).

**L.     The Beason-Hammon Act Dispute**

In 2011, Commissioner Buckner and the ADHR attempted to ascertain how the newly enacted and controversial Beason-Hammon Immigration Act, an Alabama law, would impact ADHR's operations.  (Doc. 37-11 at p. 15).  Ms. Ficquette and Mr. Long, as the two highest ranking attorneys for ADHR, were tasked with providing legal opinions on the new law as it effected ADHR.  (Doc. 37-11 at pp. 15-16).  Mr. Long and Ms. Ficquette had a disagreement over the interpretation of a point of the new law and its impact on ADHR operations.  They each presented their legal opinion to the Deputy Commissioners at ADHR, and one of the Deputy Commissioners decided that Ms. Ficquette's interpretation would became the official policy of ADHR.  (Doc. 26-1 at p. 24).

Mr. Long informed Ms. Ficquette that he felt compelled to put in writing his disagreement with her opinion and advice to ADHR.  (Doc. 26-1 at pp. 24-25).  He drafted and sent an email memorandum to seventeen people, including high ranking employees within ADHR, expressly disagreeing with Ms. Ficquette's interpretation of the statute and the implications to ADHR.  (Doc. 26-1 at pp. 24-25).

Ms. Ficquette considered the email an act of insubordination and became concerned that it would create confusion within ADHR.  (Doc. 26-1 at pp. 24-25).  On November 7, 2011, she sent Mr. Long a written memorandum expressing her

concerns about their disagreement and Mr. Long's mass email.  In the memo, Ms. Ficquette accused Mr. Long of violating state personnel rules.  (Doc. 26-1 at p. 25).

Mr. Long concluded he was being disciplined.  He attempted to initiate a formal grievance within ADHR, but was told he could not do so because Ms. Ficquette's memorandum was not discipline under personnel rules.  (Doc. 26-1 at pp. 4-6).

### M.    Mr. Long's § 36-26-27 Complaint

On January 7, 2012, Mr. Long submitted, in letter form, an administrative grievance complaint against Ms. Ficquette pursuant to Alabama Code § 36-26-27. (Doc. 26-1 at p. 2).  Consistent with the reporting requirement of the Beason-Hammon Act and § 36-27-27, the letter complaint was sent to the Attorney General of Alabama and to the Director of the Personnel Department.  (Doc. 26-1 at p. 2).  On January 23, 2012, Mr. Long amended the complaint in the form of another letter.[10] (Doc. 26-1 at p. 70).

The initial letter complaint charges Ms. Ficquette with violating the Beason-Hammon Act and personnel rules.  (Doc. 26-1).  The amended letter complaint asserts allegations of race discrimination and retaliation.  (Doc. 26-1 at pp. 70-71).  With regard to those complaints, Mr. Long testified in *Rawls* that they came as a result of

---

[10] Both letters are notarized beneath Mr. Long's signature. (Doc. 26-1).

the November 7, 2011, Beason-Hammon Act memorandum he received from Ms. Ficquette charging him with violating personnel rules, failure to perform his job functions, and insubordination. (Doc. 36-2 at pp. 132-135). Mr. Long described Ms. Ficquette's memorandum as a "write up," but he did not believe that it would have a negative impact on a future performance appraisal. (Doc. 36-2 at pp. 132-135). His § 36-26-27 complaints were dismissed by an Administrative Law Judge for lack of jurisdiction.

## N.   The Default Judgment

As discussed above, in addition to giving ADHR legal advice, Mr. Long defended ADHR in active litigation. On August 4, 2011, a state civil lawsuit was brought by an individual in the Circuit Court of Jefferson County, Alabama, against several named defendants including ADHR. (Doc. 29-21). After ADHR was served with the complaint and a summons, Ms. Ficquette assigned the case to Mr. Long. (Doc. 29-2 at ¶ 27). Subsequently, on October 27, 2011, a default judgment was entered against ADHR in that action. (Doc. 29-2 at ¶ 27, Doc. 29-21). Mr. Long did not file a responsive pleading on behalf of ADHR nor did he otherwise appear in court to defend his client. (Doc. 29-2 at ¶ 27, Doc. 29-21).

Around the same time that Mr. Long and Mr. Ficquette were in the midst of the row over the Beason-Hammon Act, Commissioner Buckner learned of the default

judgment against ADHR and informed Ms. Ficquette on November 2, 2011.  (Doc. 29-2 at ¶ 27).

Mr. Long was out of the office on a business trip; however, upon his return on November 7, Ms. Ficquette informed Mr. Long of the default judgment and directed him to immediately address the matter.[11]  (Doc. 29-2 at ¶ 27).  He explained to Ms. Ficquette that he confused the Jefferson County lawsuit with another case involving the same plaintiff and excused his lapse by blaming his heavy case load.  (Doc. 36-11 at pp. 53-54).  The following day, Mr. Long filed an opposed motion to set aside the default judgment.[12]  (Doc. 29-21).  Therein, he did not provide the state court with an explanation for his failure to appear and defend ADHR in the lawsuit. (Doc. 29-21).  Mr. Long's motion to set aside was granted by the state court.

On December 13, 2011, Ms. Ficquette issued a written reprimand to Mr. Long for failure to perform his job based on the entry of default judgment in one of his assigned cases.   Mr. Long contends that white attorneys who allowed default judgment to be entered against ADHR were not reprimanded.

_____

[11] To help put the timing of the material events of this lawsuit in context, on November 7, 2011 — the day before Mr. Long moved to set aside the default judgment against ADHR — he wrote a memorandum in reply to Ms. Ficquette's memorandum of instruction about his actions following their disagreement on the Beason-Hammon Act.

[12] The motion to set aside also requested various other relief and findings from the state court. Those matters are not relevant to this case.

### O.    Mr. Long's Email Soliciting a Bid for Burglar Bars

Also on November 7, 2011, Mr. Long emailed someone at John M. Patterson State Technical College[13] in Montgomery, Alabama, from his work computer and used his professional title of Deputy Attorney General for the purpose of inquiring about having burglar bars installed at his home.  (Doc. 37-11 at pp. 32-33).  It is unclear on the evidence of record whether Mr. Long emailed an individual at Patterson State who would be providing the quote as a private citizen who both works for the college and personally installs burglar bars or if Mr. Long was asking the college itself for a bid and to do the work on his home.  The Defendants did not learn about this email until early-2012, and it worried Commissioner Buckner.

### P.    Mr. Long's Depositions and Production of Documents in the *Rawls* Litigation

In late-2011, while Mr. Long dealt with the default judgment entered in one of his cases and with his disagreement with Ms. Ficquette over the email he sent about his interpretation of the Beason-Hammon Act, the *Rawls* case was in the discovery phase of litigation.  Mr. David Mellon, Esq., with the law firm of Sirote & Permutt,

---

[13] John M. Patterson State Technical College is a public institution, operating under the control of the State of Alabama.  The institution at one time was an independent entity; however, it was merged with H. Councill Trenholm State Technical College by the Alabama Board of Education.  The former Patterson State is now operated as a satellite campus under the Trenholm State name and administration, and it remains a public entity.  (*See* http://www.trenholmstate.edu/college-info/about-trenholm.cms).

was retained by ADHR to defend it in *Rawls*.  (Doc. 29-22 at ¶ 5).  Mr. Mellon took

Ms. Rawls's deposition on December 11, 2011.

As mentioned above, Ms. Rawls testified that Mr. Long told her multiple times

over a number of years that he had "confidential information" that would help her

prove that Ms. Ficquette and Commissioner Buckner discriminated against her on the

basis of her race.  (Doc. 36-3 at pp. 119-126).  Ms. Rawls did not know what

information Mr. Long had and assumed, based on his telling her it was "confidential"

and his failure to share specifics, his information was protected from disclosure by

virtue of legal privilege or restriction such that he could not permissibly give it or

speak of it to her but he could disclose it to someone else under unspecified, different

circumstances.  (Doc. 36-3 at p. 120).

After the conclusion of Ms. Rawls's deposition, Mr. Mellon decided that he

needed to depose Mr. Long.  (Doc. 29-22 at ¶ 12).  On January 5, 2012, Mr. Mellon

subpoenaed Mr. Long to give a deposition in *Rawls*.[14]   Mr. Long became aware of

Ms. Rawls's discrimination lawsuit against ADHR a matter of days before his first

deposition on January 10, 2012.  (*e.g.*, Doc. 36-2).

---

[14] The subpoena was issued to Mr. Long two days before he filed his first § 36-26-27 complaint against Ms. Ficquette regarding the Beason-Hammon email dispute.  Notably, the parties do not dispute that Mr. Long did not have to be compelled by subpoena to testify in *Rawls* because he was an employee of ADHR, the defendant in that case.

Under subpoena, Mr. Long gave two depositions in the *Rawls* case on January 10, 2012 and February 16, 2012, respectively.  (Doc. 29-22 at ¶ 14; Doc. 36-2 at pp. 2, 186).

The subpoena for the January 10, 2012 deposition contained a request for production of documents.[15]  (Doc. 36-11 at pp. 57-58).  Mr. Long appeared at his first deposition with eight boxes containing ADHR's documents to give to Mr. Mellon.  (Doc. 29-22 at ¶ 17; Doc. 36-2 at pp. 155, 197).  Mr. Mellon did not know that Mr. Long possessed and planned to surrender the documents, and Mr. Mellon stated that he had never seen the boxes before the January 10, 2012 deposition.[16]  (Doc. 29-22 at ¶ 18).  Mr. Long testified that he gathered and maintained the documents in his office, that the documents contained ADHR's "confidential" information that he thought would help Ms. Rawls's case against ADHR, and that he reviewed those documents prior to disclosing them at his first deposition.  (Doc. 36-2 at pp. 17, 255-258). The documents totaled "in excess of 15,000 pages" and included un-redacted

---

[15] Under the terms of the subpoena, Mr. Long was to produce any documents in his possession or control that were "relevant or related to the facts, allegations, [or] claims" in Ms. Rawls's Amended Complaint.  (Doc. 36-11 at p. 58).

[16] To the extent that one might argue that Mr. Long giving Mr. Mellon the documents is legally insignificant as it is tantamount to one of ADHR's attorneys giving his client's documents to another ADHR attorney, that argument is not applicable under the facts of this case.  Because Mr. Long produced the documents at a deposition that Ms. Rawls's attorney attended, Ms. Rawls became aware of the documents and seemingly had an arguable right to examine them to determine whether they were relevant to that lawsuit.

RAP sheets.  (Doc. 29-22 at ¶¶ 19, 20).  Mr. Long testified that, included within the documents were papers that he, independent of the CHC and unbeknownst to ADHR, maintained and that those papers contained "information on clients, individuals who are having checks, their convictions, [and] their arrest records."  (Doc. 36-2 at pp. 61, 259).

Also at the first *Rawls* deposition, Mr. Mellon asked Mr. Long if there was any information that he would testify to or evidence he would seek to offer at a trial in support of Ms. Rawls's claims against ADHR and responded, "There's probably a lot. There's a lot in those boxes[.]" (Doc. 36-2 at p. 130).  In addition to the 15,000 pages of documents, Mr. Long gave extensive oral testimony against ADHR.  (Doc. 36-2). At no time did Mr. Long assert any privilege, make an objection, or otherwise seek to protect his client's privileged or confidential information from disclosure in *Rawls*.

In the early portion of his first deposition, Mr. Long offered the following unsolicited testimony for the record:

> Before I go forward, I'm going to have to say that there's been an attempt to retaliate against me in an effort to keep me silent and to intimidate me with regard to what I'm testifying about today.
>
> On December 1, 2011, after y'all began to schedule these depositions, Sharon Ficquette, Chief Legal Counsel, white female, gave me a written reprimand on December 13, [2011] ... after she knew the depositions were going to be scheduled in order to intimidate me and to silence me with regard to my opposition to discrimination against Ms.

32

Rawls and my participation in this lawsuit and in this deposition.

(Doc. 36-2 at pp. 19-20). Other than Mr. Long's testimony about what he thought Ms. Ficquette knew before reprimanding him on December 13, 2011, about the default judgment incident, there is no evidence of record to establish that Ms. Ficquette had knowledge that Mr. Long would be subpoenaed to give deposition testimony in *Rawls*. Mr. Mellon did not make the decision to depose Mr. Long until December 18, 2011 and he noticed the deposition on January 5, 2012. (Doc. 29-22 at ¶¶ 12, 14).

The first deposition was held open by agreement of the attorneys in attendance, including Mr. Long, so that Mr. Mellon could have time to review the eight boxes of documents produced by Mr. Long. (Doc. 36-2 at pp. 155, 197).

After Mr. Long's first deposition in *Rawls*, Mr. Mellon notified ADHR that Mr. Long gave him ADHR's documents, including RAP sheets, at the deposition. (Doc. 29-22 at ¶¶ 18-20). Mr. Long did not tell Mr. Mellon that he was disclosing RAP sheets, and Mr. Mellon was not trained on how to properly handle and store RAP sheets. (Doc. 29-22 at ¶¶ 18-20). Mr. Mellon returned the RAP sheets to ADHR. (Doc. 29-22 at ¶¶ 20-21). Mr. Long does not explain why he believed RAP sheets were relevant to Ms. Rawls's employment discrimination lawsuit against ADHR. What ADHR and CHC documents Mr. Long still had in his office after the January

10, 2012 deposition were retrieved by ADHR, specifically by Ms. Ficquette. (Doc. 36-2 at p. 259). At least some of the documents in Mr. Long's January 10 production were originals and not duplicates. (Doc. 36-2 at p. 258).

## Q.    ADHR's Investigation of Mr. Long

Between Mr. Long's January 10 and February 16, 2011 depositions, ADHR opened investigations into Mr. Long's workplace activities.

In early-2012, Commissioner Buckner became concerned that Mr. Long was using his ADHR computer during work hours for personal benefit, including the prosecution of his § 36-26-27 claim against Ms. Ficquette and Ms. Rawls's lawsuit against ADHR. (Doc. 29-1 at ¶ 9). She gained access to Mr. Long's ADHR email account and conducted a manual search during which she discovered the burglar bars email. (Doc. 29-1 at ¶ 12; Doc. 37-11). Commissioner Buckner considered that email to be a possible violation of ADHR policy or state ethics laws and widened her investigation.[17] (Doc. 29-4 at ¶¶ 12-13).

At Commissioner Buckner's direction, Mr. Long's ADHR email was searched

---

[17] Commissioner Buckner found other emails of a personal nature on Mr. Long's work computer such as emails regarding church activities and banking, but it was the email about the burglar bars that caused the Commissioner alarm as she suspected Mr. Long was using his public office for private gain in violation of state law. (Doc. 37-11 at pp. 30-42). The other emails were never investigated nor were they used against Mr. Long in the pre-termination process. There is also no record of Mr. Long facing any discipline resulting from personal emails from his work computer other than the email about burglar bars.

and his computer hard drive was cloned on February 5, 2012 and again on March 5, 2012. (Doc. 37-11 at p. 40). The search terms used by ADHR on Mr. Long's computer include "State Personnel Board," "Carolyn Rawls," "retaliation," "racial discrimination," and "Ficquette." (Doc. 36-11 at p. 160). The cloning process allowed Commissioner Buckner and those working at her direction to investigate whether Mr. Long used his work computer for personal reasons, which would be a violation of ADHR policy. A report was prepared for Commissioner Buckner by individuals who investigated Mr. Long's computer, and that report was used by ADHR as evidence against Mr. Long at his pre-termination hearing. (Doc. 37-11 at pp. 39-41). It is undisputed that Defendants searched Mr. Long's work email and hard drive after he testified in the *Rawls* depositions and after he surrendered the eight boxes of documents to Mr. Mellon.

### R. Mr. Long's Second Deposition in *Rawls*

During his second deposition in *Rawls*, Mr. Long produced another "package" of documents he believed were relevant to helping Ms. Rawls with her lawsuit against ADHR and that he felt compelled to produce under the subpoena. (Doc. 36-2 at pp. 194-195). Mr. Long repeated his previous testimony that Defendants discriminated against him on the basis of his race and that they retaliated against him because of his participation in *Rawls* and his § 36-26-27 complaints.

### S.    ADHR's Pre-Termination Efforts Against Mr. Long

On March 9, 2012, Defendants notified Mr. Long by letter that they intended to seek his termination from employment and placed him on mandatory leave. (Doc. 26-12 at p. 2).  Defendants scheduled a pre-termination hearing and notified Mr. Long, in writing, of his right to attend to offer rebuttal argument and evidence in his defense.  (Doc. 26-12 at p. 2).  Mr. Long notified Commissioner Buckner that he would not participate in the hearing, and it was held in his absence. (Doc. 29-1 at ¶ 21).

### T.    The Pre-Termination Hearing and Recommendation

Mr. Long's pre-termination hearing was held before Hearing Officer Mark J. Williams, Esq., on April 4, 2012. (Doc. 26-5).  In a written recommendation to Commissioner Buckner, Hearing Officer Williams recommended that ADHR terminate Mr. Long's employment. (Doc. 26-8 at pp. 2-7).  It is undisputed that Commissioner Buckner could, at her discretion, accept, reject, or modify Hearing Officer Williams' recommendation.

By a letter dated April 20, 2012, Commissioner Buckner informed Mr. Long that she accepted the findings and recommendation from the pre-termination hearing. (Doc. 29-1 at ¶ 25).  Mr. Long was terminated as an ADHR employee that same day.

Hearing Officer Williams' conclusions and Commissioner Buckner's

acceptance of his recommendations are the subject of much of Mr. Long's briefing and form a large part of the basis for his claims in this lawsuit.  Mr. Long relies on the pre-termination hearing recommendation as grounds for his claims. Defendants lean on the same evidence in support of their motion for summary judgment.

Hearing Officer Williams recommended that the "evidence revealed multiple grounds for the termination of Mr. Long." (Doc. 26-8 at p. 2).  Specifically, the pre-termination recommendation states that Mr. Long should be terminated for falsification of documents, unauthorized use of state equipment, failure to ensure the integrity and security of records of arrest and prosecution in his charge, and disruptive conduct in the workplace.  (Doc. 26-8 at p. 2).

The falsification of documents charge was levied based on Mr. Long's refusal, in 2009, to effect the mandatory seven point deduction from Ms. Rawls's performance appraisal, as directed by Ms. Ficquette and required by ADHR Personnel Policy 3.6.  (Doc. 26-8 at pp. 2-3).  Mr. Long also neglected to obtain Ms. Ficquette's signature on Rawls's performance appraisal and he did not "process the performance appraisal" through the ADHR Personnel Office.  (Doc. 26-8 at p. 3).  Williams further found:

> On January 12, 2012, Mr. Long was deposed in a lawsuit Ms. Rawls brought against [ADHR].  In the deposition, Mr. Long admitted that he did not deduct for the reprimand of Ms. Rawls because he

considered it "illegal" and because he did not agree with the reprimand.

Mr. Long's failure to cite the reprimand of Ms. Rawls and to deduct the seven points from her evaluation and his failure to secure the reviewing supervisor's signature showed deception and constitutes a falsification of records under the rules of the State Personnel Board. **Alabama State Personnel Board Rule 670-X-19-.01(b)(6)**

As a senior attorney at [ADHR], Mr. Long understood that it was incumbent upon him to note the deduction, his personal or professional feelings notwithstanding. By failing to deduct for the reprimand of Ms. Rawls and further concealing the document from the reviewing supervisor in order to assist Ms. Rawls in her lawsuit, Mr. Long knowingly participated in the falsification of the performance appraisal of Ms. Rawls.

Because Alabama state government relies upon the honest and reliable administration of documents by state employees, the intentional decision to falsify a state document is a very serious charge.

Falsification of a state document may result in the termination of a state employee on the first offense. **Rules of the State Personnel Board 670-X-19-.01**

Mr. Long should be **terminated** for the offense of falsification of records.

(Doc. 26-8 at pp. 3-4) (bold emphasis in original).

The unauthorized use of state equipment is a product of Commissioner Buckner's and Ms. Ficquette's decision, during the *Rawls* case and after Mr. Long filed an internal grievance against Ms. Ficquette under Alabama Code § 36-26-27 regarding their disagreement over the Beason-Hammon Act, to have Mr. Long's work

computer audited.  (*e.g.*, Doc. 26-8 at p. 4).  Specifically, Mr. Long was accused of using his work computer for personal reasons, which is prohibited by ADHR Personnel Policy 13.37 and the Rules of the State Personnel Board 670-X-19-.01(1)(a)(9).  (Doc. 26-8 at p. 4).  In reliance on Personnel Board Rule 670-X-19-.01, Hearing Officer Williams determined that punishment for using a work computer for personal reasons "may be of 'increasing severity'" to include termination on the first offense.  (Doc. 26-8 at p. 4).

On the record before him, Hearing Officer Williams found that the "evidence at the hearing revealed repeated instances of unauthorized use of his state computer" including the maintenance of "a large number of documents of a personal nature ... [involving] the transaction of legal matters" over a period of "at least three months." (Doc. 26-8 at p. 4).  Williams notes that "[o]n one occasion, [Long] sent an email from the computer to inquire about getting a quote for burglar bars for his personal residence" which he then signed with "his name with his official title below his name."[18]  (Doc. 26-8 at p. 4).  Based on those instances, Williams recommended that Long terminated for unauthorized use of state equipment.  (Doc. 26-8 at p. 4).

The "failure to ensure the integrity and security of records of arrest and

---

[18] Ms. Ficquette testified that she believed Mr. Long used his state office for personal gain when he made the request for a bid for work to be done at his home from his state email account and using his title of Deputy Attorney General.  (Doc. 36-11 at pp. 75-76).

prosecution" charge is relatively straightforward.  Hearing Officer Williams noted that, based on the evidence presented at the pre-termination hearing, Mr. Long was given supervisory authority over keeping and maintaining Records of Arrest and Prosecution ("RAP sheets") within ADHR as part of his job duties.  (Doc. 26-8 at p. 5).   The RAP sheets, according to Hearing Officer Williams, are "considered confidential to the point that an employee who has them in his possession must sign an 'Operating Procedures Agreement' in which the employee agrees to keep the RAP sheets in a secure location," in a "locked office within locked cabinets," and that RAP sheets will only be used "for official state business purposes."  (Doc. 26-8 at pp. 5-6) (internal marks omitted).  Hearing Officer Williams found that Mr. Long signed such an agreement. (Doc. 26-8 at p. 5).  According to the pre-termination recommendation, a breach of the agreement "is considered a serious violation of State Personnel Work Rules and [ADHR] policy.  (Doc. 26-8 at p. 5).  Moreover, Hearing Officer Williams discussed that an employee of ADHR who does not maintain the strict confidentiality of RAP sheets stands in violation of state law and ADHR policy.  (Doc. 26-8 at p. 5) (citing Alabama Code § 38-13-8(a) and ADHR Office of Criminal History Policy 5.3).

In the pre-termination recommendation, Mr. Long was determined to have, in the course of the *Rawls* litigation, "caused" RAP sheets to be given to Mr. Mellon.

(Doc. 26-8 at p. 5).  Hearing Officer Williams noted that Mr. Mellon was not aware of the existence of the RAP sheets prior to receiving them in boxes from Mr. Long, and Mr. Mellon was not instructed on "how to handle the documents in a secure fashion" before he received them from Mr. Long.  (Doc. 26-8 at p. 5).  Once ADHR became aware that Mr. Long transferred the RAP sheets to Mr. Mellon, it initiated an investigation into the matter and determined that Mr. Long stored the RAP sheets "haphazardly" in unlocked file cabinets and in an unlocked office.[19]  (Doc. 26-8 at p. 5).

Hearing Officer Williams also writes to Mr. Long's deposition testimony in the *Rawls* case, in which Long testified, according to the pre-termination report, that "he had transmitted the RAP sheets to Mr. Mellon because he believed the documents would assist Ms. Rawls in pursuit of her discrimination claim" against ADHR.  (Doc. 26-8 at p. 5).

After determining that Mr. Long violated state law, the signed "Operating Procedures Agreement," and ADHR policy, and that the violations were tantamount to a terminable offense pursuant to State Personnel Board Rule 670-X-19-.01, Hearing Officer Williams recommended that Mr. Long's employment be terminated.

---

[19] It is material to the disposition of this case and Mr. Long does not offer evidence that he did not keep RAP sheets in an unlocked cabinet within his unlocked office.

(Doc. 26-8 at pp. 5-6).

The "disruptive conduct in the workplace" charge was described and resolved by Hearing Officer Williams as follows:

> During the time in question, Mr. Long exhibited serious mistakes in judgment that disrupted the workplace at [ADHR].

> On more than one occasion, Mr. Long appeared to go out of his way to embarrass [ADHR].

> By surreptitiously causing the RAP sheets to be transmitted to Mr. Mellon, Mr. Long was attempting to substitute his judgment for that of [ADHR], his employer.  In the process, he could have exposed himself and [ADHR] to potential liability.

> By refusing to deduct for the reprimand of Ms. Rawls, he was attempting to substitute his judgment for that of [ADHR].  In the process, he could have subjected [ADHR] to potential liability.

> An attorney for a department of state government in Alabama may not decide on an ad hoc basis whether he will side with the department on a given matter.  Further, he may not decide to advance his disagreement with the department into the legal arena; particularly when, by doing so, he could jeopardize the ability of the department to defend its position in court.

> In the present case, Mr. Long chose to depart from his role as a key, senior level attorney for [ADHR] and actually opposed [ADHR's] position in sworn testimony and in the transmittal of documents and the falsification of documents.

> "Loyalty is an essential element of a lawyer's relationship to a client." **Alabama Rules of Professional Conduct, Comment Rule 1.7**. In the present case and at all times pertinent to this matter, Mr. Long had a duty to be loyal to [ADHR].  Instead, he chose to depart from that duty

and assist an employee whose interests were contrary to those of
[ADHR].

The net effect of such behavior was disruptive to the [ADHR]
workplace.  If the [ADHR] attorney workforce were allowed to pick and
choose when it would assist [ADHR] and when it would oppose
[ADHR], the result would be chaos.  It would also result in much greater
liability on the part of [ADHR].

Because of his key position within the [ADHR] workplace
hierarchy and because he had the potential to negatively impact his
client ([ADHR]), Mr. Long's behavior rose to a level of disruption
sufficient to justify his termination.  **Rules of the State Personnel
Board 670-X-19-.01(a)(7)**.

(Doc. 26-8 at pp. 6-7) (bold emphasis in original).

### U.    ADHR Terminated Mr. Long's Employment

After ADHR initiated termination proceedings and Mr. Long was placed on

mandatory administrative leave, in a letter dated March 26, 2012, he informed

Commissioner Buckner that he had applied for retirement to be effective May 1,

2012.  (Doc. 29-1 at ¶ 19).  He requested that the April 4, 2012 pre-termination be

cancelled and that he be allowed to remain on paid leave until his retirement effective

date.  (Doc. 29-1 at ¶ 19).  Commissioner Buckner considered Mr. Long's requests

and determined that, because of the severity of the charges against Mr. Long, it was

in ADHR's best interests to proceed with its efforts to terminate his employment.

(Doc. 29-1 at ¶ 20).

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW[20]

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).[21]  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.  Once the moving

---

[20] Although there are cross-motions for summary judgment on one of Mr. Long's claims, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law as to that claim. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955) (*Nota bene*: In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently and in accordance with the Rule 56 standard. *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

[21] In 2007, Rule 56 was amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

44

party has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*

The substantive law will identify which facts are material and which are irrelevant. *See Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023. If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See *Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by

presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden

46

by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   DISCUSSION

### A.   Eleventh Amendment Immunity

Defendants argue that many of Mr. Long's claims and petitions for relief are foreclosed under the immunity provided in the Eleventh Amendment to the U.S. Constitution.  The Eleventh Amendment limits the power of federal courts to hear suits instituted by private litigants against a state.  The Amendment itself is quite brief, containing only forty-three words:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const., Amend. XI.

47

Although, by its terms, the Eleventh Amendment does not bar suits against a state in federal court by its own citizens, the Supreme Court has extended its protections to apply in such cases. *See Hans v. Louisiana,* 134 U.S. 1 (1890); *Manders v. Lee,* 338 F.3d 1304, 1308 n. 8 (11th Cir. 2003) (*en banc*).

Eleventh Amendment immunity can be averted. The Supreme Court has recognized three situations in which a state may be subjected to suit in federal court. First, a state may affirmatively waive its sovereign immunity and consent to suit in federal court. *See, e.g., Clark v. Barnard*, 108 U.S. 436, 447-48 (1883) (holding that a state's intervention in a federal court action "would be a voluntary submission to its jurisdiction").

> A State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program. In each of these situations, we require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment. As we said in *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974), "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here."

*Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 (1985). Second, states and state officials may be sued by private individuals in actions seeking *prospective* injunctive relief for *continuing* violations of federal law. *See Ex Parte Young,* 209 U.S. 123, 155-56 (1908). Finally, Congress can abrogate the states' Eleventh

Amendment immunity, but only when it unequivocally expresses an intent to abrogate the immunity through a clear legislative statement in the text of the statute itself,[22] *and*, when Congress acts pursuant to a valid grant of constitutional power.  Further, the objectives of valid enforcement legislation "must be the carefully delimited remediation or prevention of constitutional violations."  *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 672 (1999) (citing *City of Boerne v. Flores*, 521 U.S. 507 (1997)).

Defendants' arguments are properly analyzed against that backdrop.

### 1.    Title VII Claims and Eleventh Amendment Immunity

Title VII claims are not barred by the Eleventh Amendment.  "Congress unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity when it amended Title VII to cover state and local governments."  *In re Employment Discrimination Litigation Against State of Alabama*, 198 F.3d 1305, 1317 (11th Cir. 1999).  Consequently, Mr. Long's Title VII claims are not foreclosed by Eleventh Amendment immunity.

### 2.    § 1983 and Eleventh Amendment Immunity

Firstly, § 1983 does not expressly abrogate Eleventh Amendment immunity.

---

[22] *See, e.g.*, *Atascadero State Hospital*, 473 U.S. at 243 ("Congress must express its intention to abrogate the Eleventh Amendment [immunity of the states] in unmistakable language in the statute itself.").

*See Atascadero State Hospital*, 473 U.S. at 243.

As the Eleventh Circuit explained in its *en banc* decision in *Manders v. Lee*, *supra*, the law is "well-settled that Eleventh Amendment immunity bars suits brought in federal court when an 'arm of the State' is sued." *Id.* at 1308.  The more difficult question — whether the entity sued is an arm of the state — "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id.*

To determine whether a defendant, while engaged in the relevant function, acts as an arm of the state, the Eleventh Circuit has set out a four-factor inquiry, taking into account:  (1) how state law defines the entity;  (2) what degree of control the state maintains over the entity;  (3) the source of the entity's funds;  and (4) who bears financial responsibility for judgments entered against the entity.  *See Manders,* 338 F.3d at 1309.

Defendants correctly state and Mr. Long does not dispute that, "[u]nder Alabama law, [ADHR] is a state agency." (Doc. 28 at p. 57) (citing *Ex parte Macon County Dep't of Human Res.*, 716 So. 2d 743, 744 (Ala. Civ. App. 1998)).  It is undisputed that Alabama maintains absolute control over ADHR and it has not waived its immunity.  The State of Alabama is both the source of ADHR's funds and would have ultimate financial responsibility for any judgments against ADHR. As

50

such, Eleventh Amendment immunity bars Mr. Long's claims against ADHR asserted through the remedial vehicle of § 1983, with one exception.

As discussed above, the one caveat to the rule regarding injunctive relief is that a plaintiff may circumvent Eleventh Amendment immunity when he is seeking prospective injunctive relief to bar ongoing unconstitutional action.  *See Ex Parte Young, supra*.  To the extent that Mr. Long is seeking to enjoin, through the vehicle of § 1983, the Defendants from perpetuating constitutional violations, his claims can go forward to a substantive review.

### 3. Official Capacity Claims against Buckner and Ficquette; ASEPA Claims and Eleventh Amendment Immunity

As to Ms. Ficquette and Commissioner Buckner, to the extent they are being sued in their official capacities, Eleventh Amendment immunity is applicable — suits brought against state officials in their official capacity is, effectively, a restatement of a claim against the state itself.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).  As such, Eleventh Amendment immunity bars Mr. Long's § 1983 First Amendment retaliation and § 1981 claims against Ms. Ficquette and Commissioner Buckner in their official capacities, except to the extent that he seeks prospective injunctive relief.

The official capacity ASEPA claim against Ms. Ficquette and Commissioner

Buckner are likewise foreclosed by Eleventh Amendment immunity. Neither Congress nor the State of Alabama waived Eleventh Amendment immunity with respect to ASEPA claims. *See*, *e.g.*, Alabama Code § 36-26A-6 (1975) (ASEPA does not create a new cause of action against the state).

In summary, Eleventh Amendment immunity bars Mr. Long's claims against ADHR, Ms. Ficquette and Commissioner Buckner, in their official capacities, for monetary damage and retroactive monetary relief regarding his § 1983 claims. Eleventh Amendment immunity does not shield those Defendants from the remedy of prospective injunctive relief, including reinstatement. The ASEPA claim is barred against ADHR, Ms. Ficquette and Commissioner Buckner, in their official capacities. Mr. Long's Title VII claims for race discrimination and retaliation survive at this juncture and will be discussed on their merits.

## B.    Qualified Immunity for Defendants Buckner and Ficquette

Ms. Ficquette and Commissioner Buckner argue that they are entitled to qualified immunity from the First Amendment retaliation claim brought against them in their individual capacities. (Doc. 28 at pp. 88-90). "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have

known." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citations omitted).

The summary judgment requirement to "review all evidence and make all reasonable inferences in favor of the party opposing summary judgment," *Chapman*, 229 F.3d at 1023, takes on even greater force when, in a case founded upon 42 U.S.C. § 1983, a state governmental official files a Rule 56 motion interposing the affirmative defense of qualified immunity.  In such cases, the court normally must answer the legal question of whether the governmental official is entitled to qualified immunity under the plaintiff's version of the facts as supported by the evidence of record when cast in a light most favorable to the plaintiff.  *See*, *e.g.*, *Saucier v. Katz*, 533 U.S. 204, 201 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question:  *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the officer's conduct violated a constitutional right?") (emphasis supplied).

### 1.    Discretionary Authority

"To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority."  *Cottone*, 326 F.3d at 1357-58.

Mr. Long's individual capacity claims against Ms. Ficquette and Commissioner

Buckner are derivative of adverse employment actions he suffered because of those individuals' actions or decisions. For qualified immunity purposes, the pertinent issue is whether those Defendants acted within their discretionary authority when imposing workplace discipline or terminating Mr. Long's employment. The undisputed evidence of record is that Ms. Ficquette, as Mr. Long's direct supervisor, had the authority to impose or recommend discipline and to recommend Mr. Long's termination to Commissioner Buckner. The Commissioner has the ultimate disciplinary and firing authority for ADHR. On the record, when viewed in a light most favorable to Mr. Long, Ms. Ficquette and Commissioner Buckner acted within their discretionary authority.

### 2.      Violation of a Clearly Established Constitutional Right

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

The Supreme Court has established a two-part test to determine the applicability of qualified immunity. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations [or, if qualified immunity is asserted at summary judgment, the evidence construed in a light most favorable to the plaintiff], if true, establish a constitutional violation." *Hope v.*

*Pelzer*, 536 U.S. 730, 736 (2002); *see also*, *Saucier*, 533 U.S. 194.  In *Pearson*, the

Supreme Court unanimously held that a court need not strictly adhere to the *Saucier*

sequence requiring, first, a determination that there are allegations or evidence of a

constitutional violation and, second, a finding of whether the right was clearly

established.  *See* 129 S. Ct. at 818.  In this instance, the interests of justice are best

served by foregoing a decision on the constitutional violation issue and moving ahead

to determine whether a right was clearly established.[23]

The "clearly established" requirement is designed to assure that state officers

have fair notice of the conduct which is proscribed. *Hope,* 536 U.S. at 739. Qualified

immunity ensures "that before they are subjected to suit, officers are on notice their

conduct is unlawful." *Saucier,* 533 U.S. at 206. The "unlawfulness must be apparent"

under preexisting law. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

In *Saucier*, the Supreme Court said, "[t]he relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." 533

U.S. at 202. "In this circuit, the law can be 'clearly established' for qualified

immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit

---

[23] For the reasons discussed *infra*, Mr. Long's First Amendment rights were not infringed upon by Defendants. Nevertheless, as the parties raise the issue of whether a "clearly established" right is present in this case, the court proceeds to a discussion of that element.

Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826-27 n.4 (11th Cir. 1997) (internal citations omitted). Hence, if it is not "clear" that conduct is unlawful, qualified immunity is to be applied. A state officer is entitled to immunity protection as long as she "could have believed" her conduct was lawful. *Hunter v. Bryan,* 502 U.S. 224, 227 (1991). To preclude qualified immunity, Mr. Long must affirmatively demonstrate that "no reasonable competent officer would have" acted as Ms. Ficquette or Commissioner Buckner did. *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Mr. Long does not meet his burden. He frames his argument in opposition to summary judgment on qualified immunity from the point of view of what a reasonable juror might decide with regard to his First Amendment retaliation claim on the evidence in this case. (Doc. 39 at pp. 95-97). That argument misses the mark. The question of whether a constitutional right is clearly established on the facts of a particular case is matter of law for a court to decide and not a fact question for a jury. *See Hope*, 536 U.S. at 736.

The parties argue over the persuasiveness of this court's reasoning and conclusion in *Hartwell v. City of Montgomery, Alabama*, 487 F. Supp. 2d 1313 (M.D. Ala. 2007) (Thompson, J.). In *Hartwell*, the court was confronted with a qualified immunity defense regarding a plaintiff's First Amendment retaliation claim and

undertook a detailed analysis of the "clearly established" issue after making a finding

on the merits that the First Amendment was violated.  487 F. Supp. 2d at 1330.  The

court concluded that, because there was a "relatively close" question on whether [the

plaintiff] spoke as a citizen on a matter of public concern ... the court concludes that

[the defendant sued in his individual capacity] is entitled to qualified immunity[.]"

*Id.* at 1332.  *Hartwell* is not especially informative here as the question is not

especially "close."

> The *Hartwell* court remarked that,

> > When it comes to a First Amendment claim for retaliation, the
> > Eleventh Circuit has observed that the plaintiff's burden is a heavy one:
> > "Because *Pickering* requires a balancing of competing interests on a
> > case-by-case basis, our decisions tilt strongly in favor of immunity by
> > recognizing that only in the rarest of cases will reasonable government
> > officials truly know that the termination or discipline of a public
> > employee violated 'clearly established' federal rights. When no
> > bright-line standard puts the reasonable public employer on notice of a
> > constitutional violation, the employer is entitled to immunity except in
> > the extraordinary case where *Pickering* balancing would lead to the
> > inevitable conclusion that the act taken against the employee was
> > unlawful."

*Hartwell*, 487 F. Supp. 2d at 1330 (quoting *Hansen v. Soldenwagner*, 19 F.3d 573,

576 (11th Cir.1994)).  "The salient question is whether the state of the law at the time

of the events in question gave the defendants fair warning that their alleged treatment

of the plaintiff was unconstitutional."  *Id.* (citations and marks omitted).

For the reasons discussed *infra*, the *Pickering* analysis in this case leads to the conclusion that Mr. Long's First Amendment rights were not violated.  Since no constitutional violation is present in this case, Ms. Ficquette and Commissioner Buckner could not be found to have been on notice that their actions violated a clearly established right.

Without invoking the court's ultimate recommendation on the merits of Mr. Long's First Amendment retaliation claim, Mr. Long's failure to point to any case law in support of the proposition that Ms. Ficquette and Commissioner Buckner were on notice that they were violating Mr. Long's clearly established First Amendment rights at the time they terminated his employment is material to the qualified immunity issue. The court conducted an extensive, unsuccessful search for binding case law that weighs in Mr. Long's favor.[24]  Because there is no binding case law to inform Ms. Ficquette and Commissioner that they were potentially violating Mr. Long's clearly established First Amendment rights, they are entitled to qualified immunity.

### E.   Title VII and § 1981 Claims

As an initial matter, the elements of proof for a § 1981 claim are essentially the

---

[24] The Supreme Court's recent pronouncement in *Lane v. Franks*, --- U.S. ----, 134 S.Ct. 2369 (2014), at least arguably establishes that Mr. Long spoke as a private citizen on a matter of public concern in *Rawls*.  However, that case has no bearing on the qualified immunity issue because it was decided over two years after the events that form the factual basis of this lawsuit.  *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (the right must be clearly established at the time the individual defendant acts).

same as for a Title VII claim.  *See*, *e.g.*, *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (describing § 1981 as "a parallel remedy against discrimination which . . . derive[s] its legal principles from Title VII") (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).  In other words, because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework, . . . we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also*, *e.g.*, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief with Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706 [of Title VII, *i.e.*, 42 U.S.C. § 2000e-5].") (citations omitted).

Indeed, the Eleventh Circuit has long recognized that when "a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985).  *See also*, *e.g.*, *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination.  . . .  The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the

formulation used in Title VII discriminatory treatment cases.") (citations omitted) (emphasis in original); *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n.2 (11th Cir. 1984) (same).

Accordingly, this court will "explicitly address the [plaintiff's] Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well." *Standard*, 161 F.3d at 1330.

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was based on intentional discrimination or retaliation. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). A plaintiff can meet his or her burden of proof either through direct evidence or circumstantial evidence.

In this case, Mr. Long argues that there is both direct and circumstantial evidence of retaliation. He relies on circumstantial evidence in support of his race discrimination claim. (Doc. 39 at p. 85).

Federal courts typically evaluate the sufficiency of circumstantial evidence using some variant of the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department*

*of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  As Justice O'Connor observed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), "the entire purpose of the *McDonnell Douglas prima facie* case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Id.* at 271 (O'Connor, J., concurring).

Under the *McDonnell Douglas* framework, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6.  The plaintiff's burden to initially satisfy the elements of a *prima facie* case is not great.  *Burdine*, 450 U.S. at 253 ("The burden of establishing a *prima facie* case ... is not onerous."); *see also*, *e.g.*, *Turlington v. Atlanta Gas Light Co.*, 153 F.3d 1428, 1432 (11th Cir. 1998) ("[A] plaintiff's burden in proving a *prima facie* case is light."); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (*per curiam*) ("Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference [sic] [*give rise to a rebuttable presumption*] of discrimination.") (alteration added).

"The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action."  *Combs v.*

61

*Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254); *see also*, *e.g.*, *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (same).

To rebut the presumption of intentional discrimination, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id*. at 257, the presumption of discrimination created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding in the context of a Rule 50 motion that "a plaintiff's *prima facie* case, combined with sufficient evidence to

find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### 1.    Race Discrimination

While the parties have briefed the question of whether Long has made a *prima facie* case of race discrimination, the court need not address that point to decide the merits of summary judgement on Mr. Long's race discrimination claims. Where the "court has sufficient evidence to determine whether the employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden shifting process and should instead reach the ultimate issue of discrimination." *Shuford v. Alabama State Bd. of Educ.*, 978 F. Supp. 1008, 1017 (M.D. Ala. 1997) (Thompson, J.). Judge Thompson and the Eleventh Circuit Court of Appeals also took this approach in the *Rawls* case when ruling on ADHR's motion for summary judgment in that action. *See Rawls v. Alabama Dep't of Human Resources*, 507 Fed. Appx. 895, 898, 2013 WL 500456, at *3 (11th Cir. Feb. 11, 2013); *Rawls v. Alabama Dep't of Human Resources*, 2012 WL 1319495, at *6 (M.D. Ala. April 17, 2012).

Because the evidence in this case, when cast in a light most favorable to Long, allows for the opportunity to "reach the ultimate issue of discrimination," the court will take a cue from *Rawls* for the purpose of recommending a ruling on the Defendants' motion for summary judgment and assumes, without deciding, that Mr. Long has established a *prima facie* claim of race discrimination.

The analysis now shifts to "the real question ... whether the employer's legitimate, non-discriminatory reason is pretextual." *Bailey-Potts v. Alabama Dep't of Public Safety*, 2012 WL 566820, at *4 (M.D. Ala. Feb. 21, 2012) (Thompson, J.). "This insight is particularly true where, as here, a plaintiff's discriminatory-discipline [or termination] claim rests on whether the employee actually violated workplace rules." *Rawls v. Alabama Dep't of Human Resources*, 2012 WL 1319495, at *6 (M.D. Ala. April 17, 2012) (Thompson, J.), *aff'd by Rawls v. Alabama Dep't of Human Resources*, 507 Fed. Appx. 895, 2013 WL 500456 (11th Cir. Feb. 11, 2013).

In this case, even under a liberal construction of the facts in Mr. Long's favor, Mr. Long violated workplace rules for which the range of punishments include termination from employment. The violations include the improper storage of RAP sheets predating *Rawls* and his production of RAP sheets to unauthorized individuals. As discussed above, RAP sheets are protected documents within the CHC and ADHR pursuant to an agreement Mr. Long signed, internal policies, and Alabama law.

64

Those documents contain intimate and personal information about members of the general public and include personal identifying information such as names, social security numbers, and dates of birth.  Mr. Long not only mishandled the RAP sheets by keeping them in an unlocked cabinet in an unlocked office (violations of personnel rules), he gave the RAP sheets to a private attorney and placed them into an unsealed deposition record in a federal lawsuit.  It is undisputed in this case that ADHR's personnel rules and policies dictate that such conduct can constitute a terminable offense.

Mr. Long cannot meet his burden to show pretext on the evidence of record.  Mr. Long argues that "a reasonable jury could find that the four reasons articulated in the Hearing Officer's letter recommending termination (which Commissioner Buckner accepted without modification) are ... a pretext for discrimination ... and therefore insufficient to meet [Defendants'] burden of articulating legitimate reasons." (Doc. 39 at p. 87) (emphasis in original).  Mr. Long does not explain how, on that evidence, a jury could draw a discriminatory conclusion.  He simply states the argument as fact, but there is no evidence to support the premise.  Also, the argument overlooks that Mr. Long did, in fact, violate ADHR rules and policies and that there is scant evidence of record that Mr. Long's termination from employment was

motivated by a discriminatory animus.[25]

On this record, under a liberal viewing in Mr. Long's favor, he has failed his burden of proof to demonstrate pretext as an issue of fact for trial on his race discrimination claim.

### 2.    Retaliation

"Retaliation is a separate violation of Title VII."  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in

---

[25] The "scant" evidence is not enough to create an issue of fact for trial when considering the record as a whole.  Mr. Long relies on two pieces of evidence in support of the notion that his termination was based on his race.  First, he points out that he is black and the individuals who terminated him are white.  That is insufficient to create an issue of fact for trial.  Also, the evidence is non-specific and wholly conclusory such that it is not properly considered by a court when ruling on summary judgment. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 and n.6 (11th Cir. 1998) (a district court properly struck a conclusory and generalized affidavit when ruling on summary judgment).  Second, he believes the proper comparitor in this case is a white attorney who received a merit system promotion to Attorney III after his termination.  Mr. Long ignores the fact that the next Deputy Attorney General hired to succeed him at ADHR is black.  By law, ADHR can only employ one deputy attorney general at a time.  There is no evidence of record that the job duties or rank of Deputy Attorney General at ADHR changed after Mr. Long's termination.  The person who took the Deputy Attorney General position is the likeliest comparitor for Mr. Long.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (a proper comparitor is "nearly identical to the plaintiff").  Instead, he ignores this unhelpful fact and argues that the appropriate comparitor is a white attorney who was the first individual to be promoted to Attorney III within ADHR after his termination.  While a comparitor need not have the same job title as Mr. Long, "material differences in 'ranks and responsibilities' may render comparison impossible."  *Horn v. United Parcel Service, Inc.*, 433 Fed. Appx. 788, 793 (11th Cir. 2011).  That attorney is not a proper comparitor in that the lawyer is not similarly situated or "nearly identical" to Mr. Long in her experience level or duty station.  She was promoted in the branch office in Calhoun County while Mr. Long worked as a senior level attorney in the Montgomery central office.  She never held the position of Deputy Attorney General.  Finally, there is no evidence about what her job duties entailed or to suggest that her job duties were similar to Mr. Long's.

activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Congress thus recognized two predicates for retaliation claims: one for opposition to discriminatory practices, and another for participation in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted). The instant case involves both opposition and participation.

The Supreme Court recently held that, as to the causation standard for a retaliation claim, a plaintiff must "show that the [adverse employment action] would not have occurred in the absence of — that is, but-for — the defendant's conduct." *University of Texas Southwestern Med. v. Nassar*, 570 U.S. ---, 133 S. Ct. 2517, 2525

(2013).[26]  In other words, a plaintiff has to "establish that his or her protected activity was a but-for cause [and not just a motivating factor] of the alleged adverse employment action by the employer." *Nassar*, 133 S. Ct. at 2534.

### a.    Direct Evidence

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001), *overruling on other grounds recognized by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (holding that the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d

---

[26] The parties note that there is a split among various federal courts as to whether it is appropriate to impose the *Nassar* standard at the *prima facie* or pretext stage of analysis.  The conflict need not be resolved or even addressed here.

1181, 1189 (11th Cir. 1997) (same); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir. 1982) ("Where the evidence for a *prima facie* case consists . . . of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the *prima facie* evidence the ultimate issue of discrimination is proved; no inference is required."). *See generally Black's Law Dictionary* 577 (7th ed. 1999) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). As such, "direct evidence of discrimination is powerful evidence capable of making out a *prima facie* case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321,

1323 n.11 (11th Cir. 1998) (*per curiam*).

"To amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co*., 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001). "[S]tatements that are open to more than one interpretation do not constitute direct evidence of racial discrimination." *Carter*, 132 F.3d at 642 (citing *Harris v. Shelby County Board of Eduaction*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996)).

Traditionally, direct evidence has been viewed as "somewhat of a nuclear bomb" to a defendant's motion for summary judgment. *Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261, 1273 (M.D. Ala. 1998) (citing *Merritt v. Dillard Paper Co*, 120 F.3d 1181, 1189 (11th Cir. 1997), and *Mize v. Jefferson City Bd. of Edu.*, 93 F.3d 739, 742 (11th Cir. 1996)). That is the effect Mr. Long seeks in this case.

As Defendants point out, the authority Mr. Long relies on are either not "direct evidence" cases or are cases in which a court found that the evidence was circumstantial, not direct. For example, relying on *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008), Mr. Long posits that direct evidence shows a "logical connection that would justify a prescription that the protected participation in fact prompted the adverse action." (Doc. 39 at pp. 47-49) (quoting *Goldsmith*).

70

The "logical connection" language is a more lax standard than the generally accepted "requiring no inferential leap" definition of direct evidence. *Goldsmith* does not represent a shift in the Eleventh Circuit's definition of "direct evidence." The portion of *Goldsmith* on which Mr. Long relies is a discussion on employment discrimination litigants' burdens of proof associated with the causal link element of a retaliatory discharge claim. Nothing in that decision speaks to the quality or definition of direct evidence. The words "direct evidence" simply appear in a sentence of the decision.

Using the proper "no inferential leap" standard, the court turns to the evidence Mr. Long considers to be direct evidence. Mr. Long looks first to Hearing Officer Williams's pre-termination recommendation as being direct evidence of retaliation. Hearing Officer Williams made several findings that Mr. Long was due to be terminated from his employment because: (1) he falsified documents because he refused to deduct seven points from Ms. Rawls's performance appraisal in 2009 because he believed the discipline was discriminatory; (2) he was guilty of "disruptive conduct" because, by assisting the plaintiff in *Rawls*, he violated his duty of loyalty to ADHR by assisting Ms. Rawls in her litigation against ADHR; and (3) he transferred confidential RAP sheets to Mr. Mellon during the course of the *Rawls* litigation. (Doc. 39 at pp. 49-51). Mr. Long argues that, because each of those reasons are related to his role in *Rawls*, they are tantamount to direct evidence of

71

retaliation. Different inferences could be drawn from the pre-termination recommendation.

As to Mr. Long's refusal to deduct points from Ms. Rawls's performance appraisal because he believed the discipline was unlawful race discrimination, a non-retaliatory inference in Defendants' favor could be drawn from the language of the recommendation itself — *i.e.*, Mr. Long violated ADHR policy by not properly filling out and submitting the 2009 performance appraisal. The pre-termination recommendation does not plainly state that Mr. Long was to be terminated because he opposed discrimination. It recommends termination because Mr. Long did not follow personnel rules and policies with regard to the 2009 performance appraisal. Because more than one inference can be gleaned on the evidence, it is not direct evidence of retaliation.

The same is true for the pre-termination recommendation speaking to Mr. Long's involvement in *Rawls*. The undisputed fact is that Mr. Long is an attorney. His client was ADHR. Unlike other professions, attorneys owe a professionally mandated duty of loyalty to their clients, and an attorney can be expelled from the profession for violating that duty. That is a fundamental job requirement and one which every employer or client has a right to expect. Mr. Long's abandonment of his duty of loyalty provides a legitimate reason for his client to terminate his continued

representation.  The inference that ADHR terminated Mr. Long, in part, because he failed to exercise a strict duty of loyalty, which is a core job requirement for his position at ADHR, is an alternative inference that can be drawn from the pre-termination recommendation.

Mr. Long's production of RAP sheets to Mr. Mellon is not direct evidence of retaliation.  It takes at least an inferential leap to conclude that Mr. Long's giving RAP sheets to Mr. Mellon in *Rawls* and Defendants' reaction to that disclosure is retaliatory *per se* and to the exclusion of all other inferences. The fact that the hearing officer noted that Mr. Long maintained and disclosed RAP sheets is likewise not direct evidence of retaliation.

In addition to the pre-termination report, Mr. Long argues that the search terms used by Defendants to investigate Mr. Long's work email account and computer are direct evidence of retaliation because they contain the terms "Carolyn Rawls," "retaliation," and "racial discrimination." (Doc. 39 at p. 52).  A defendant's use of the words "retaliation" and "race discrimination" are not, without context, direct evidence.  Mr. Long ignores undisputed evidence that provides the context for the use of those search terms and from which different inferences could be drawn other than "race discrimination" and "retaliation."   Shortly before Commissioner Burkett authorized the search of Mr. Long's email and computer, she became concerned that

73

Mr. Long was impermissibly using his work computer for personal reasons including prosecuting his and Ms. Rawls's legal claims against ADHR.  Each of the search terms could be explained as providing tools to Defendants to determine if Commissioner Buckner's concern was founded, and there is no evidence that Commissioner Buckner lacked the authority to search Mr. Long's work computer for any reason.  There is no direct evidence that Defendants investigated Mr. Long's computer and email <u>because</u> he participated in *Rawls*, and the search terms do not qualify as direct evidence standing on their own or in the context of the evidence of record, without the necessity of making an inference.

Mr. Long's purported "direct evidence" is circumstantial.  Because Mr. Long's retaliation claim is premised on circumstantial evidence, the familiar burden shifting paradigm of *McDonnell Douglas* is appropriate.  *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) ("[a]bsent direct evidence, a plaintiff may prove intentional discrimination through the familiar *McDonnell-Douglas* paradigm for circumstantial evidence claims").

### b.    Retaliation on the Merits

As with Mr. Long's race discrimination claim, the court can reach the ultimate issue of Mr. Long's retaliation claim without engaging in the *prima facie* analysis. *See Rawls*, *supra*.  Without deciding the question of a *prima facie* case of retaliation

on its merits, Mr. Long established a *prima facie* case of retaliation for purposes of this recommendation.

In addressing the issue of pretext, the Supreme Court has stated:

Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. <u>For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred</u>. . . .

<u>Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors</u>. Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148-49 (2000) (emphasis by underlining added) (citations omitted). Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse action, judgment as a matter of law in favor of the

employer is still appropriate if the record: (1) conclusively demonstrates some other, non-retaliatory basis for the decision; or (2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal retaliation took place.

ADHR terminated Mr. Long for legitimate reasons that he cannot explain away on the evidence of record.  Stepping away from the issue of Mr. Long's termination being tied to his duty of loyalty to his client, there are other legitimate, non-retaliatory reasons in the record for Mr. Long's termination that, even when viewed in a light most favorable to Mr. Long, demonstrate a non-retaliatory basis without the need for the weighing of evidence or a credibility determination.

First, as discussed *supra*, Mr. Long did not maintain the RAP sheets in accordance with ADHR policy and Alabama law.  That, aside from his production of those documents to a third party, exposed ADHR to potential liability. It also compromised the privacy and personal information of an unknown number of private citizens who had an expectation that the RAP sheet information would be maintained in accordance with the law.  His improper gathering and maintaining RAP sheets outside of ADHR's knowledge and control is undisputedly a terminable offense in and of itself.

The fact that ADHR only became aware of Mr. Long's long-running practice of gathering and storing RAP sheets in his office when Mr. Long decided to produce

the RAP sheets in *Rawls* does not grant protected status to the otherwise terminable

conduct.  One cannot expect to use the opposition or participation clause of Title VII

or the anti-retaliation body of law related to § 1981 as a shield against terminable

wrongdoing that is not directly related to opposition or participation.  Terminating

Mr. Long because of the way he stored and maintained RAP sheets is legitimate and

non-retaliatory.  Mr. Long cannot show pretext in this case and Defendants are

entitled to summary judgment.

Because the foregoing reason is legally sufficient, the court need not speak

Defendants' remaining arguments that it had legitimate reasons to terminate Mr.

Long's employment or that his termination was an inevitability.

That said, Mr. Long and Defendants both point to the issue of loyalty as being

a key to their arguments on Mr. Long's retaliation claims.  It is undisputed that Mr.

Long was fired, in part, because of his disloyalty to ADHR, and that the disloyalty is

linked, again in part, to his opposition to race discrimination and participation in

*Rawls*.  Mr. Long argues that fact, considered in tandem with Commissioner

Buckner's deposition testimony that she concluded that Mr. Long was not loyal to

ADHR and that she was not "sure if it was an ethical thing to do ... being an attorney

representing [ADHR]" and "getting involved in other people's cases against" ADHR,

is tantamount to evidence that Mr. Long was fired because he engaged in protected

activity.  (Doc. 39 at p. 54).

In support of that argument, Mr. Long relies on a case from the Southern District of Alabama in which that court noted that "surely a reasonable factfinder could view the 'disloyalty' explanation as mere code for ... protected activity ... After all, what could be more disloyal than accusing the company of 'illegal' activity and talking to other employees about it[?]" (Doc. 39 at p. 55) (quoting *Crabtree v. Volkert, Inc.*, 2012 WL 6093802, at *15 (S.D. Ala. Dec. 7, 2012)).  Relying on *Crabtree*, Mr. Long explains that the "disloyalty" Commissioner Buckner testified to is a code for protected activity.  On the portion quoted by Mr. Long, *Crabtree* appears as though it might provide persuasive authority to support his argument.

However, *Crabtree* is a Fair Labor Standards Act retaliation case, not an employment discrimination case.  The plaintiff in *Crabtree* is a "real estate specialist" for an engineering firm, and there is no indication in that decision that a "real estate specialist" owes any duty of loyalty to his employer.  The facts and analysis of *Crabtree* are not informative in this employment discrimination case where the plaintiff is not employed in the field of real estate with an engineering firm; rather, he is an attorney who represented one of the Defendants.  It is in that context that Commissioner Buckner testified — that she thought Mr. Long violated his duty of loyalty and professional ethics by acting against his client.  That issue is not present

in *Crabtree*.

It is undisputed that Mr. Long violated his professionally mandated duty of loyalty to ADHR over the course of at least six years, and that at least some of his disloyalty occurred two or three years before he engaged in any arguably protected activity in *Rawls*. Mr. Long's argument in this case that engaging in protected activity and then suffering a subsequent adverse employment action — for any reason — is an all-or-nothing event that forecloses any defense on summary judgment. That is not the state of the law nor is it consistent with the evidence in this case, even when viewed in a light most favorable to Mr. Long.

In Mr. Long's opinion, the retaliation claim is simple because he engaged in protected activity in 2011 and 2012 and he was terminated from his employment, in part, because of events Defendants learned about after he was deposed in *Rawls*. What that opinion and this record are critically lacking is evidence of causation. He cannot show "but-for" causation on this record, and it would be too broad a reading of *Nassar* to conclude that just because an adverse employment action follows protected activity then the adverse employment action was caused by the protected activity.

### F.    First Amendment Retaliation

Mr. Long claims that Defendants terminated his employment in retaliation for

his exercise of his right to free speech and expression guaranteed by the First Amendment to the U.S. Constitution. Specifically, Mr. Long avers that his termination is retaliation in violation of his First Amendment rights because he spoke as a private citizen on a matter of public concern when (1) he submitted his § 36-26-27 complaint against Ms. Ficquette for what he believed were violations of the Beason-Hammon Act; and (2) he opposed discrimination and participated in *Rawls*. (Docs. 12 & 39). Mr. Long argues that Defendants had no legitimate interest in restricting his speech at issue and terminating his employment. Defendants contend that Mr. Long's speech on both issues was not protected under the First Amendment and that ADHR had legitimate reasons to terminate his employment.

When Mr. Long served as a Deputy Attorney General for the State of Alabama, he was the employee of a public, governmental entity. Generally, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Cellabos*, 507 U.S. 410, 421 (2006). Public employees who speak as private citizens on matters of public concerns, however, are generally entitled to First Amendment protection from retaliation by their governmental employers. That general statement of the law, however, is deceptively complex. As the Supreme Court recently observed,

Speech by citizens on matters of public concern lies at the heart

80

of the First Amendment, which "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). This remains true when speech concerns information related to or learned through public employment. After all, public employees do not renounce their citizenship when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights. *See, e.g., Keyishian v. Board of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 605, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Pickering* [*v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, [568] (1968)], 88 S.Ct. 1731; *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For "[g]overnment employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). "The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe*, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (*per curiam*).

*Lane v. Franks*, --- U.S. ----, 134 S.Ct. 2369, 2377 (2014).

The counterbalance in favor of public employers is that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Lane*, 134 S.Ct. at 2377 (quoting *Garcetti*, 547 U.S. at 418).

Merging those concepts, "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the

employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks*, --- U.S. ----, 134 S.Ct. 2369, 2374 (2014) (quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)) (internal marks and revisions omitted).

The path a court must follow to determine whether a public employee's speech is protected is two-fold.  Initially, a finding must be made that "the employee spoke as a citizen on a matter of public concern."  *Garcetti*, 547 U.S. at 418 (citations omitted); *see also, Lane*, 134 S.Ct. at 2378.[27]  The element also has two parts: If the employee was not speaking as a "citizen" or as "a matter of public concern," the employee has no First Amendment cause of action for retaliation by his employer. *Id.*  Whether a public employee speaks in the scope of his job duties or as a private citizen is a question of law based on the facts of a particular case.  *Lane*, *supra*. Likewise, "[w]hether something is a matter of public concern is a question of law for the court."  *Presley v. Graham*, 936 F.Supp.2d 1316, 1322 (M.D. Ala. 2013) (Watkins, J.) (citing *Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983)).

---

[27] Before the Supreme Court decided *Lane* and *Garcetti*, this step of analysis was commonly referred to as the *Connick* test.  *See Flood*, 948 F. Supp. at 1543; *Connick v. Myers*, 461 U.S. 138, 146 (1983).

### 1.    Employee Speech vs. Citizen Speech

Defendants argue that Mr. Long acted within the scope of his employment and not as a private citizen when he filed his § 36-26-27 complaint in January 2012.  The court agrees.  The undisputed evidence of record is that Mr. Long thought he had a duty to report Ms. Ficquette's alleged violations of the Beason-Hammon Act to his superiors.  As an attorney for ADHR, part of Mr. Long's job duties were to ensure that the department was in compliance with the law.  Indeed, he and Ms. Ficquette were tasked with the responsibility of advising ADHR and Commissioner Buckner about the immigration law's effect on ADHR and its operations.  Mr. Long expressed his disagreement with Ms. Ficquette's interpretation of the immigration law in emails, internal memoranda, meetings, and in his § 36-26-27 complaint to the Attorney General and the Director of the Personnel Department.

While § 36-26-27(b) allows charges of improper conduct to be brought against state employees by any citizen or taxpayer, the statute also permits other state employees to file grievances.  The § 36-26-27 complaint filed by Mr. Long does not fall outside of his job duties.  To the contrary, as an attorney tasked with interpreting the Beason-Hammon Act for ADHR and safeguarding ADHR's interests, once he did not receive a personally satisfactory result by reporting to those within the ADHR his opinion that Ms. Ficquette operated in a manner inconsistent with his interpretation

of the immigration law, another avenue of redress is through alerting the Attorney General and the Department of Personnel via a § 36-26-27 charge against Ms. Ficquette.

There is no evidence in the record to suggest that the bringing of a § 36-26-27 charge falls outside of the job duties of a Deputy Attorney General. As if to underscore that Mr. Long made his charges in his capacity as an attorney for ADHR, he signed his January 7 and January 23, 2012 § 36-26-27 charges as "Deputy Attorney General Alabama Department of Human Resources" and included his work mailing address, email address, and telephone number.

Speaking to the first step of analysis, "'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" *Lane*, 134 S.Ct. at 2378 (quoting *Garcetti*, 547 U.S. at 421). Because Mr. Long spoke as a public employee and not as a citizen when making his § 36-26-27 complaints, the § 36-26-27 charges are not protected speech under the First Amendment.[28]

---

[28] Because Mr. Long did not speak as a citizen when making his § 36-26-27 charges related to the Beason-Hammon Act, the court does not reach the question of whether he spoke on a matter of public concern. That said, § 36-26-27 complaints trigger the need for a public hearing, and the immigration law's impacts on ADHR are arguably a matter of public concern.

84

As such, Mr. Long cannot succeed on a First Amendment retaliation claim regarding his § 36-26-27 complaints and Defendants are entitled to summary judgment on Mr. Long's First Amendment retaliation claim as it is predicated on those facts.

Turning to the question of whether Mr. Long spoke as a citizen or a public employee when he testified in *Rawls*, that is neatly disposed of in this instance.  In *Lane*, the Supreme Court considered "whether the First Amendment ... protects a public employee who provided truthful sworn testimony, compelled by subpoena, outside the course of his ordinary job responsibilities" and held "that it does."  *Id.* at 2374-75. In light of *Lane* and for the limited purposes of the instant motions for summary judgment, Defendants concede that Mr. Long spoke as a citizen when he gave testimony in *Rawls*.  (Doc. 45 at p. 35).  For purposes of Mr. Long's First Amendment retaliation claim on the basis of his testimony in *Rawls*, the court will proceed as though Mr. Long spoke as a citizen and not as an employee.

## 2.    Matters of Public Concern

Turning to the second element of the *Connick* test, the issue is whether Mr. Long spoke on a matter of public concern in his testimony in *Rawls*.  Defendants hotly contest this point and contend that Mr. Long's speech was of no concern to the public at large.  That is not so.  Charges of racial discrimination within a state agency

or department that are brought to the forum of federal court, as in *Rawls*, are not mere internal grievance matters.  Mr. Long cites the case of *Presley v. Graham*, 936 F. Supp. 2d 1316, 1323 (M.D. Ala. 2013), in which the court held that an employee's participation in a gender discrimination lawsuit constituted a matter of public concern.  *See Presley*, 936 F. Supp. 2d at 1323 (citing *Konits v. Valley Stream Central High School Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) (gender discrimination is a matter of public concern); *Brawner v. City of Richardson*, 844 F.2d 187, 191-92 (5th Cir. 1988) (noting generally that "misbehavior of public officials" is a matter of public concern)).  While ADHR ultimately prevailed in *Rawls*, that lawsuit concerned Ms. Rawls's allegations of then ongoing racial discrimination at the highest levels of ADHR.  The holding and reasoning in *Presley*, a gender discrimination lawsuit, is persuasive and instructive when answering the question of whether a race discrimination lawsuit against a state entity is a matter of public concern.  As to the *Rawls* litigation, that lawsuit touched on a matter of public concern for purposes of Mr. Long's First Amendment retaliation claim.

In conclusion, with regard to his testimony in *Rawls*, Mr. Long acted as a citizen on a matter of public concern.

### 3.    The *Pickering* Test

Should a public employee successfully leap the first hurdle of *Lane* and its

predecessors, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."[29] *Garcetti*, 547 U.S. at 418 (citations omitted).  On the matter of a public employer's authority to treat its employees differently in the context of free speech, the Eleventh Circuit sets out the following:

> When the government acts as an employer, it has far broader powers than the government acting as sovereign. *Shahar v. Bowers*, 114 F.3d 1097, 1110 (11th Cir.1997) (*en banc*). This is so because the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006) (citing *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983)). Consequently, the government has "broad discretion" to make employment decisions. *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir.2007) (*per curiam*) ... As such, "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate [employees and contractors] for no reason at all." *Umbehr*, 518 U.S. at 674, 116 S.Ct. at 2347.

*Walden v. Centers for Disease Control and Prevention*, 669 F.3d 1277, 1285-1286 (11th Cir. 2012) (bracketed text in original).  The *Pickering* test, as it pertains to this

---

[29] Before the Supreme Court decided *Lane* and *Garcetti*, this step of analysis was commonly referred to as the *Pickering* test.  *See Flood*, 948 F. Supp. at 1543; *Pickering v. Bd. of Educ. of Township High School Dist. 205*, 391 U.S. 563, 568 (1968).

litigation

requires the court to "strike the proper balance between the interest of that employee in speaking freely and the interests of the state, as an employer, in promoting the efficient delivery of public services." *Waters v. Chaffin*, 684 F.2d 833, 836 (11th Cir. 1982). To do this, the court "must consider several factors: (1) whether the speech at issue impeded the government's ability to perform its duties effectively; (2) the manner, time and place of the speech; and (3) the context within which the speech was made." *Fikes* [*v. City of Daphne*], 79 F.3d [1076,] at 1084 [(11th Cir. 1996)]. In addition to these factors, the court must also consider the nature of the employee's job, *Bates v. Hunt*, 3 F.3d 374, 378 (11th Cir. 1993), and the nature of the employer's mission. *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991). A "confidential" or "policy-making" employee—one who works closely with the leaders of the organization and is privy to confidential information—is expected to be loyal to his employers, and therefore "does not have much protection under the First Amendment when he speaks or acts in a hostile way toward his employer." *Bates*, 3 F.3d at 378. Other employees who have less responsibility will receive more protection. In addition to considering the nature of the employee's job, the court must consider the nature of the organization and the services it provides. Some organizations, such as police departments, must maintain "loyalty, discipline, morale, and a favorable reputation with the public," *Busby*, 931 F.2d at 774, in order to effectively perform their duties and efficiently deliver services to the public. Other organizations can tolerate more dissension and still efficiently perform their duties. Finally, and "more simply," in conducting this balancing test, the court must keep in mind that "one who cheers for the robbers has no right to ride with the police." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).

*Flood v. State of Ala. Dept. of Indus. Relations*, 948 F.Supp. 1535, 1543-44 (N.D. Ala. 1996) (Thompson, J.).   In the present case, the three *Fikes* elements weigh against Mr. Long.

88

Mr. Long's involvement in *Rawls* was undisputedly one of the reasons he was terminated from his position as an attorney for ADHR.  He argues that fact, standing alone, should preclude summary judgment on his First Amendment claim.  That argument ignores the law.

Attorneys, such as Mr. Long, who are employed by a governmental department are afforded very little protection under the First Amendment for speech based on information they gathered during the course of their employment.  The Supreme Court held that, in the context of upholding the termination of an assistant district attorney based on her exercise of her free speech rights,

> [w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

*Connick*, 461 U.S. at 150-52.  The Eleventh Circuit has held that even prospective employees's First Amendment rights do not trump the government's need to control the content of its employees' expression when an attorney seeks employment in a state attorney general's office.  *Shahar*, 114 F.3d at 1104-1108.

Whether the employee is an attorney or not, there is binding case law that will not shield a public employee who enjoys his employer's confidences and involves

himself in litigation that is adverse to his public employer. Generally, "[i]t is clear that the First Amendment does not provide a right to continued government employment in a capacity that is inconsistent with, and undermined by, one's off-duty expressive conduct." *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992) (citations omitted). When an employee involves himself in a lawsuit that is adverse to his public employer,

> public employees retain First Amendment rights to express themselves. The giving of affidavits for use in lawsuits or otherwise acting voluntarily as a witness in a lawsuit is a kind of speech that might be protected by the First Amendment. But, the First Amendment rights of public employees are limited by the right and the duty of the government to act as an efficient employer doing work that matters. Some balancing is required, even when the employee wishes to speak about matters of public importance.

*Bates v. Hunt*, 3 F.3d 374, 377 (11th Cir. 1993) (citing *Pickering*, 391 U.S. at 568; *Connick*, 461 U.S. at 151-53). "[T]his balancing is one for the court to make as a matter of law." *Bates*, 3 F.3d at 377.

> In reality, voluntarily aiding in litigation against a person or his interests is an extremely hostile act toward that person; and the more personally jeopardized the defendant is by the litigation, the more hostile and worrisome the act of aiding the litigation will be. To say the least, an employer can reasonably believe that someone who voluntarily aids a lawsuit for damages against him personally is no ally.

*Bates*, 3 F.3d at 378 ("At-will public employees involved in litigation antagonistic to their employers personally have not always fared well when they invoked the First

90

Amendment as a shield from dismissal."). *See also*, *Shahar v. Bowers*, 114 F.3d 1097, 1103 (11th Cir. 1997) ("We have previously pointed out that government employees who have access to their employer's confidences or who act as spokespersons for their employers, as well as those employees with some policy-making role, are in a special class of employees and might seldom prevail under the First Amendment in keeping their jobs when they conflict with their employers.").

Moreover, "Staff Attorneys inherently do (or must be ready to do) important things, which require the capacity to exercise good sense and discretion (as the Attorney General, using his considered judgment, defines those qualities): advise about policy; have access to confidential information (for example, litigation strategies); speak, write and act on behalf of the Attorney General and for the State." *Shahar*, 114 F.3d at 1104. In a First Amendment retaliation context, the Eleventh Circuit squarely held that an "Attorney General—who is an elected official with great duties and with no job security except that which might come from his office's performing well—may properly limit the lawyers on his professional staff to persons in whom he has trust." *Shahar*, 114 F.3d at 1104. A staff attorney position is analogous to Mr. Long's job as a Deputy Attorney General for the State of Alabama.

All of the knowledge Mr. Long has of matters pertaining to *Rawls* was learned

during the course of his employment as an attorney for ADHR. In consideration of the foregoing authority — dictating that public employees who participate in litigation against their employer do so largely at their peril and that attorneys are afforded very little relief under the First Amendment because of the confidences they are required to keep in the course of their employment — when balancing the government's interest in controlling Mr. Long as the second highest ranked attorney within ADHR, the only conclusion to be drawn is fatal to Mr. Long's First Amendment retaliation claim. After Mr. Long betrayed his client's and employer's confidence, ADHR had no reason to trust him as its attorney. Moreover, the Legal Office could not function with Mr. Long as an attorney among its ranks. *See Fikes*, *supra*.

The manner and context of Mr. Long's speech — private legal advice to Ms. Rawls, production of confidential documents, and arguably privileged deposition testimony in a federal lawsuit — damaged ADHR. *See id.* No matter how noble he believed his reasons were, Mr. Long used his position as an attorney to the detriment of ADHR. His termination as ADHR's lawyer is not a violation of Mr. Long's First Amendment rights. On balance, ADHR's interests heavily outweigh Mr. Long's interest in speaking freely. *See Lane* & *Pickering*, *supra*.

As such, Mr. Long's First Amendment retaliation claim fails as a matter of law.

### G.    ASEPA Claims[30]

The ASEPA is, in essence, "a whistleblower law." *Flood v. State of Ala. Dept.*

*of Indus. Relations*, 948 F. Supp. 1535, 1549 (M.D. Ala. 1996).  It provides that a

> supervisor shall not discharge, demote, transfer, or otherwise
> discriminate against a state employee regarding the state employee's
> compensation, terms, conditions, or privileges of employment if the state
> employee reports, under oath or in the form of an affidavit, a violation
> of a law, a regulation, or a rule promulgated pursuant to the laws of this
> state, or a political subdivision of this state, to a public body.

Ala. Code § 36-26A-3 (1975) (internal marks omitted).  The remedies provided are

that a court, in its discretion, "may order, where appropriate, payment of back wages,

front wages, and compensatory damages, or any combination of these remedies."

Ala. Code § 36-26A-5 (1975).  By its plain language, the ASEPA "shall not be

construed to prevent or prohibit a supervisor from disciplining, discharging,

transferring, or otherwise affecting the terms and conditions of a state employee's

employment no connected with the conduct protected by this chapter."  Ala. Code §

36-26A-7 (1975).

Mr. Long seeks damages that are both available and not available under

---

[30] Defendants argue that none of the Defendants is a proper party to an ASEPA lawsuit in part because the State of Alabama did not waive its sovereign immunity guaranteed under the state constitution in the ASEPA.  Under Defendants reasoning, there is seemingly no proper party to an ASEPA lawsuit.  That issue has not been addressed by the courts of Alabama, and it will not be discussed here because the Defendants are entitled to summary judgment on the merits of Mr. Long's ASEPA claim.  That issue of first impression is properly left to the state courts or the state legislature.

ASEPA against Ms. Ficquette and Commissioner Buckner in their individual capacities.[31]  (Doc. 12 at pp. 17-18).  In his Amended Complaint, Mr. Long seeks an award of back pay, front pay, compensatory damages, and injunctive relief.  (Doc. 12 at p. 18).  The remedies of back pay, front pay, and compensatory damages are available; however, the ASEPA "does not provide for injunctive relief." *Flood*, 948 F. Supp. at 1550 n. 55 (M.D. Ala. 1996) (citing Ala. Code § 36-26A-5 (1975)).

As stated in the statute, an action can only be brought by a "state employee." Ala. Code. § 36-26A-3 (1975).  That is of particular importance here, as Defendants correctly argue, because Mr. Long was not a "state employee" as that term is defined by the ASEPA.  That is a determination of law, not of fact.  A "state employee" is someone "defined as a classified employee" under Ala. Code 36-26-2.  Ala. Code § 36-26A-2(2) (1975).  A state employee is in the "classified service" if he or she holds an "[office or position] of trust or employment in the state service now or hereafter created except those placed in the unclassified service or exempt service by this article."  Ala. Code § 36-26-2 (1975).  An unclassified or exempt employee is not protected by the ASEPA and cannot bring a valid claim under that law.  *See Lane v.*

---

[31] As discussed above, Mr. Long's ASEPA claim against Ms. Ficquette and Commissioner Buckner in their official capacities are barred by Eleventh Amendment immunity.  Assuming that Mr. Long could maintain an official capacity ASEPA claim against those Defendants, the analysis of the claim on its merits would be equally applicable.

*Central Alabama Community College*, 2012 WL 5873351, at *2 (N.D. Ala. Nov. 20, 2012) (holding that an exempt employee who was not in the classified service has no protection and cannot bring suit under the ASEPA).

The evidence of record establishes both that a Deputy Attorney General is an unclassified position and that Mr. Long understood that, as a Deputy Attorney General, he was not a classified or merit employee.  As a matter of law, a Deputy Attorney General is not a merit system or classified position.  *See* Ala. Code §§ 36-15-5.1(a)-(f) (1975).

Despite his own testimony that he understood he was an unclassified employee as a Deputy Attorney General, Mr. Long asserts that he was simultaneously employed as both an unclassified Deputy Attorney General and as a classified Attorney III.  He reasons that if he maintained or reverted to his Attorney III classification during and after his termination as a Deputy Attorney General, he can proceed under the statute. In support of that argument, Mr. Long cites a written clarification in his personnel file stating that his employment records should reflect that he was terminated from his Deputy Attorney General position and also from his former Attorney III classified rank.   Mr. Long, however, misapprehends the plain language of the written clarification that makes it clear that he "occupied" (past tense) a merit position before becoming an "unclassified" Deputy Attorney General, and that ADHR could "revert"

him to Attorney III after terminating his employment as a Deputy Attorney General, but did not do so.  (Doc. 36-2 at p. 2).  There is no text in the written clarification that could even be charitably construed as lending credence to the notion that he simultaneously occupied a merit and unclassified position.

Mr. Long also relies on an Alabama statute providing that,

> In the event that an attorney serving in the classified service of the State of Alabama shall accept appointment as a deputy attorney general and shall later be removed or resign from the position of deputy attorney general, the attorney shall revert to his or her former position in which he or she held status in the classified service. The reversion shall be without loss of salary or other benefits which would have accrued to the attorney and to which the attorney would have otherwise been entitled had he or she remained within the classified service.

Ala. Code § 36-15-5.1(e).  That statute states only that a Deputy Attorney General *reverts* to a merit employee if he is removed or resigns his unclassified position.  It does not state that the positions are occupied contemporaneously.

Mr. Long's arguments are not persuasive and are clearly contrary to Alabama law.  The State of Alabama only recognizes three types of employees: exempt, unclassified, and classified.  *See* Ala. Code § 36-26-10(a) (1975).  There is no provision in Alabama law allowing one individual to be both a classified and unclassified employee simultaneously.  Absent a statute carving out such a classification, the court will not and cannot create an exception here.  To do so would

defy the structure of Alabama's employment system.

The best Mr. Long can hope for is an argument that he reverted to a classified employee when he was fired as a Deputy Attorney General on April 9, 2012, and that he held merit status for that day alone. Assuming, *arguendo*, Mr. Long indeed reverted to an Attorney III when he was terminated as a Deputy Attorney General in 2012, that does not give rise to an ASEPA claim for events that took place when Mr. Long was not in the classified service. As all the events Mr. Long relies on to support his ASEPA claim happened while he was not a classified employee, and therefore not a "state employee" under the ASEPA, Mr. Long cannot bring an ASEPA claim based on those events.

In the alternative, assuming *arguendo* that Mr. Long could be considered a "state employee" during the relevant time period for his ASEPA claim, he did not engage in protected conduct under the statute. The ASEPA requires that a "state employee" make a complaint "under oath" or in an affidavit to qualify for the protections of the law. Ala. Code § 36-26A-3 (1975). The parties proceed on summary judgment as though the critical "under oath" element of an ASEPA claim is satisfied in this case; however, a review of the record and relevant legal authority leads to a different conclusion.

Mr. Long assumes that his January 7, 2012 "complaint" and January 23, 2012

"amended complaint" against Ms. Ficquette within the state administrative system are documents made under oath and containing sworn testimony. (Doc. 25). Those two documents are in the form of letters addressed to the Attorney General of Alabama and the Director of the Alabama Personnel Department. (Doc. 26-1). Mr. Long signed each letter and a notary public witnessed the documents on the signature page; however, there is no indication that the letters are intended to contain sworn testimony.

In the present litigation, Mr. Long refers to those letters throughout his briefing on the motions for summary judgment as the "verified" complaint, "verified" amended complaint, or as affidavits, but he does not offer any legal basis for giving the letters those designations. On examination of the documents, they are letters that do not contain any sworn testimony. The documents Mr. Long calls affidavits, "verified" complaints, and "verified whistleblower" complaints are not "verified" within the legal meaning of the word. (*e.g.*, Doc. 26 at p. 2).

The term "verify" has a specific legal meaning in that it refers to pleadings or documents that are made under oath and contain sworn testimony. "[I]t is clear that the requirement of a verification under modern codes and statutes in legal proceedings and pleadings means to confirm or substantiate by oath." *S.B. McMaster, Inc. v. Chevrolet Motor Co.*, 3 F.2d 469, 471 (E.D. S.C. 1925); *see also*,

*Matter of Muscatell*, 106 B.R. 307, 309 (Bkrtcy. M.D. Fla. 1989) ("as long as the unsworn declaration includes the phrase, 'penalty of perjury,' and states the document is true" an unsworn declaration is deemed to be verified).

"'Oath or affirmation' is a <u>formal</u> assertion of, or attestation to, the truth of what has been, or is to be, said." *Flood*, 948 F. Supp. at 1551 (emphasis added).  An oath cannot be inferred or implied.  *See*, *e.g.*, *Flood*, 948 F. Supp. at 1551 (noting that, in an ASEPA case, a plaintiff who appeared before the Attorney General of Alabama pursuant to a subpoena commanding the plaintiff to "testify truthfully" did not meet the "under oath" requirement of the statute where there was no evidence that the plaintiff was sworn in).  The swearing in process for an oral witness or a written sworn statement acknowledging that an affiant is giving written sworn testimony

> is designed to ensure that the truth will be told by insuring that the witness or affiant will be impressed with the solemnity and importance of his words.  The theory is that those who have been impressed with the moral, religious or legal significance of formally undertaking to tell the truth are more likely to do so than those who have not made such an undertaking or been so impressed.

*Flood*, 9478 F. Supp. at 1551-52 (quoting *United States v. Turner*, 558 F.2d 46, 50 (2d Cir. 1977) (internal marks omitted)).

Nowhere within the two letters does Mr. Long make it clear or even hint that he is offering sworn testimony, under oath, and subject to the penalty of perjury.

Without such an attestation by Mr. Long, the letters are not verified complaints nor are they affidavits.

This is not a form over substance issue, such as has been admonished by courts in the past. *See*, *e.g.*, *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1146 (5th Cir. 1973) (noting that when an attorney makes a filing in court that does not fit the form of an affidavit, the court should accept the deficient filing by an officer of the court in the interest of fairness over form).   In addition to bearing no indication that the statements Mr. Long makes in the letters are intended to be made under oath, the letters were never filed in any court such that Mr. Long, as an officer of the court, could be subjected to disciplinary action if the contents were not truthful representations to the bench.   It appears as though Mr. Long is coloring his description of the January 7 and January 23, 2012, letters in an effort to give the documents more weight in the context of his ASEPA claim.  Calling a notarized letter an affidavit and a verified complaint does not make it so.

The ASEPA does not provide a classified employee with any protection without the predicate of testimony made "under oath."  *See* Ala. Code § 36-26A-3 (1975).  Mr. Long's ASEPA claim rises and falls on his January 2, 2012 and January 23, 2012 letters (the § 36-26-27 complaint and amended complaint).  Mr. Long notes, in his motion for partial summary judgment, that Defendants admit, in their Answer

to the Amended Complaint, that "while employed with [ADHR], Plaintiff made an allegation, under oath, regarding an alleged violation of law." (Doc. 13 at ¶ 72). Defendants' admission in their Amended Answer on that point is sufficient to remove any factual dispute on that matter from being at issue in this case, but it does not resolve the pertinent legal question. That determination is critical to an ASEPA claim.

## IV.   CONCLUSION

Accordingly, for the reasons as stated, it is the **RECOMMENDATION** of the Magistrate Judge that (1) Plaintiff's motion for partial summary judgment on his ASEPA claim (Doc. 25) is due to be **DENIED**; and (2) Defendants' motion for summary judgment (Doc. 27) is due to be **GRANTED**.

Finally, it is **ORDERED** that the parties shall file any objections to the said Recommendation on or before **November 24, 2014.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by

the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).[32]

**DONE** and **ORDERED** this 10th day of November, 2014.

/s/ Paul W. Greene
United States Magistrate Judge

---

[32] *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *Bonner*, *supra* (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).