[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10856

_____

D.C. Docket No. 2:13-cv-00176-MHT-PWG

JAMES LONG,

                                             Plaintiff - Appellant,

versus

ALABAMA DEPARTMENT OF HUMAN RESOURCES,
NANCY BUCKNER,
Commissioner of the Alabama Department of Human
Resources, in her individual and official capacities,
SHARON E. FICQUETTE,
General Counsel for DHR, in her individual and official
capacities,

                                             Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(May 31, 2016)

Before ROSENBAUM, JULIE CARNES, and DUBINA, Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiff James Long appeals the district court's order granting summary judgment on his race discrimination and retaliation claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and dismissing without prejudice his state law claim under the Alabama State Employees Protection Act ("ASEPA"), Alabama Code § 36-26A-1 *et seq.* After a careful review of the record, and with the benefit of oral argument, we affirm the district court's grant of summary judgment on Plaintiff's federal race discrimination claim and reverse its grant of summary judgment on Plaintiff's federal retaliation claim. We remand Plaintiff's retaliation claim and his state law claim to the district court for proceedings consistent with this opinion.

## BACKGROUND

I.   Facts

This case arises from Plaintiff's employment with and termination from the Alabama Department of Human Resources ("the Department"). The Department is a state agency that administers family and child welfare programs in Alabama. Plaintiff, a black male, worked as an attorney in the Department's legal department from 1983 until he was terminated in 2012. At all times relevant to this litigation, Nancy Buckner was the Department's Commissioner. As Commissioner, Buckner

was the final decisionmaker as to all Department employment decisions.  Sharon Ficquette was the Department's general counsel and Plaintiff's direct supervisor from 2005 until he was terminated.

### A.    Plaintiff's Hiring and Promotions

Plaintiff was hired by the Department as an Attorney I, which was an entry level position under Alabama's merit civil service system.  He was promoted to Attorney II in 1984 and to Attorney III in 1987.  Attorney III is the highest merit rank Plaintiff obtained while he worked at the Department.[1]  However, Plaintiff received a significant promotion outside the merit system in 2006, when he was appointed as the Department's Deputy Attorney General ("Deputy AG") by then Alabama Attorney General Troy King.  As Deputy AG, Plaintiff served directly under the Department's general counsel, Ms. Ficquette.

Plaintiff was in the Deputy AG position when he was terminated.  His duties in that position included representing the Department and its staff in litigation, reviewing and drafting legislation pertaining to the Department's operations, supervising the Montgomery Regional Office and the Office of Criminal History Checks, and providing legal advice to Department staff members on issues related to their duties.

### B.    The Unpaid Invoice Dispute

---

[1]  The general counsel is the only attorney in the Department's legal department who holds the highest merit designation of Attorney IV.

1.   <u>Alabama's Background Check Law</u>

Alabama passed a law in 2000 requiring the Department to obtain criminal history information on individuals licensed to work in certain child care facilities and Department-sanctioned foster and adoptive homes.  To meet the Department's obligations under the law, Plaintiff established the Office of Criminal History Checks ("OCHC") in 2001.  Pursuant to the law, OCHC sent requests for criminal history information to the Department of Public Safety ("Public Safety").  The latter ran its own background checks for crimes committed in Alabama and obtained information from the FBI for crimes committed nationwide.  When requested, Public Safety provided criminal history information to OCHC and then invoiced OCHC for these services.

2.   <u>Invoice Backlog</u>

Plaintiff hired Carolyn Rawls, a black female, to be the program manager of OCHC in 2003.  In 2008, during Rawls's tenure as program manager, a dispute arose between Public Safety and OCHC concerning a backlog of unpaid invoices. The dispute escalated and ultimately was submitted to the Alabama Board of Adjustment ("Board"), a state agency charged with settling monetary claims against other state agencies.

During this adjustment process, Rawls was asked on two occasions to provide information necessary to verify claims for payment that Public Safety had

submitted to the Board.  According to Department general counsel Ficquette,

Rawls's responses were untimely and incomplete.  Ficquette also became aware,

while the adjustment process was ongoing, that Rawls had directly told a Public

Safety official that Public Safety would be eligible for payment in a specified

amount after the adjustment hearing.  Ficquette construed Rawls's statement to

Public Safety official as a promise of payment that Rawls was not authorized to

make on behalf of the Department.  Ficquette viewed the statement as improper

and stated that it compromised the Department's relationship with Public Safety.

### 3.   February 11, 2009 Reprimands

In early 2009, Ficquette reviewed the backlogged Public Safety invoices and

the system Rawls had created to reconcile them with payments already made by

the Department.  Based on her review, Ficquette concluded that the reconciliation

system was inadequate.  As a result, on February 11, 2009, Ficquette issued a

written reprimand to Rawls charging her with (1) failing to develop an adequate

means of clearing invoices and paying bills to Public Safety, (2) failing to respond

to requests for information necessary to resolve the invoice dispute, and (3)

inappropriately communicating directly with Public Safety concerning its claims

for payment.  The reprimand stated that Rawls would receive a seven-point

deduction on her next performance appraisal.

Ficquette also reprimanded Plaintiff on February 11, 2009 in connection with the OCHC unpaid-invoice dispute.  In Plaintiff's reprimand, Ficquette noted that OCHC had experienced recurring problems with bill reconciliation and that Rawls, while under Plaintiff's supervision, had (1) failed to respond appropriately to requests for information necessary to resolve the current dispute with Public Safety and (2) improperly communicated directly with Public Safety during the adjustment process.[2]  The reprimand charged Plaintiff with inadequate supervision of OCHC, and stated that Plaintiff would receive a seven-point deduction on his next performance appraisal.

Also in February 2009, Plaintiff and Rawls were removed from their OCHC supervisory roles and replaced in those roles by white employees Tommy Crabtree and Nancy Jinright.  Although Plaintiff no longer supervised OCHC, he remained in his Deputy AG position.  Rawls was briefly transferred to another section within the Department, but she resigned a few months after the transfer.

### 4.   Plaintiff and Rawls's EEOC Charges

Plaintiff and Rawls filed EEOC charges against the Department alleging that the February 2009 reprimands were racially motivated.  Although Plaintiff dropped his charge related to the 2009 reprimand, Rawls pursued her charge and filed a federal race discrimination suit against the Department on January 3, 2011.  *See*

---

[2]  Ficquette had advised Plaintiff in April 2006 that OCHC needed closer supervision.

6

*Rawls v. Alabama Dep't of Human Res.*, 2012 WL 1319495 (M.D. Ala. 4/17/12). In support of the claims asserted in her suit, Rawls alleged that she was removed from her position at OCHC so that her job could be given to Crabtree, a white employee with less experience, education, and seniority.

5.   <u>Rawls's February 18, 2009 Performance Appraisal</u>

During Rawls's tenure at OCHC, Plaintiff was her rating supervisor and Ficquette was her reviewing supervisor.  As rating supervisor, Plaintiff was responsible for conducting Rawls's yearly performance appraisal in consultation with Ficquette.  The Department's written policy stated that rating and reviewing supervisors should agree on the results of an appraisal before the appraisal was discussed with the employee, and that the appraisal should then be signed by the reviewing supervisor and sent to the Department's personnel office.

Plaintiff met with Rawls on February 18, 2009 to conduct her appraisal for the January 1, 2008 to January 1, 2009 period.  Instead of deducting seven points in the appraisal for the reprimand Rawls received on February 11, 2009, Plaintiff indicated that Rawls had a zero disciplinary score, and he also gave her a total score of "exceeds standards" for job performance.  Plaintiff testified that he did not deduct the points because he (1) did not agree with the reprimand and believed it

7

was illegal under Title VII and (2) thought the deduction was not required because the reprimand was issued outside the rating period that ended on January 1, 2009.[3]

Plaintiff did not confer with Ficquette before conducting Rawls's appraisal, and he did not obtain Ficquette's signature on the appraisal after he completed it. In addition, the appraisal was not sent to the Department's personnel office, as required by Department policy.  Plaintiff testified, however, that it was not common practice for him to discuss an employee appraisal with Ficquette prior to meeting with the employee and that he returned Rawls's 2009 appraisal to the appropriate Department staffer, who should have forwarded it to Ficquette and then on to the personnel office.

Rawls received a copy of the appraisal on the date Plaintiff discussed it with her, and she submitted it in support of her EEOC charge against the Department. Neither Ficquette nor Buckner was aware of the contents of the appraisal until it was produced during discovery in the *Rawls* litigation.

C.     **Beason-Hammon Act Dispute**

Plaintiff became embroiled in another dispute with Ficquette in late 2011. Earlier that year, Alabama passed the Beason-Hammon Act, which imposed

---

[3]  On the second point, the Department's written policy did not expressly require a deduction for reprimands issued outside the rating period.  Ficquette testified that the points should have been deducted from Rawls's 2009 appraisal because the conduct that resulted in the reprimand occurred during the rating period, but Plaintiff testified that a deduction based on a reprimand issued outside the rating period would have violated personnel rules.

citizenship and immigration-status verification requirements on state agencies.

Plaintiff and Ficquette were asked to provide legal opinions as to how the Act

impacted the Department, and they disagreed about whether its requirements

applied to foster home approvals and church day-care exemptions issued by the

Department, with Long believing these types of approvals were "licenses" subject

to the requirements of the Act, and Ficquette believing they were exempt.

In October 2011, Department management adopted Ficquette's opinion as

the official Department policy.  That is, management determined that the

Department would not apply the verification requirements of the Beason-Hammon

Act to foster home approvals and church day-care exemptions.  Plaintiff responded

to the decision by sending an email to twenty people, including Ficquette and other

high-ranking Department employees, expressing his disagreement with Ficquette's

interpretation of the Act and its implications for the Department.  Plaintiff

acknowleged in the email that a decision had been made to adopt Ficquette's

position on the matter, but noted that he continued to "personally be of the opinion

that foster homes and church exemptions are types of official permission and

therefore licenses" subject to the requirements of the Act.

Ficquette advised Plaintiff in a November 7, 2011 memorandum of

instruction that she thought his email was inappropriate.  In the memorandum,

Ficquette admonished Plaintiff that he should have expressed his disagreement as

to the interpretation of the Beason-Hammon Act in a confidential statement rather than in an email distributed to high-ranking Department officials.  She reminded Plaintiff that the legal department does not set policy, but rather provides legal opinions to Department management for its consideration.  She stated that Plaintiff's provision of divergent legal advice as to the interpretation of the Act created confusion within the Department, and that he had been disruptive and insubordinate.

Plaintiff responded to the November 7 memorandum of instruction with a notice of grievance and a memorandum defending his actions.  In his response, Plaintiff demanded that the November 7 memorandum be withdrawn and destroyed, and he formally requested a grievance proceeding under the Department's personnel rules.  After reviewing the response and meeting with Plaintiff, Ficquette advised him that she believed the November 7 memorandum of instruction was proper and that the matter was not grievable because it did not involve a formal disciplinary action.

### D.    The Default Judgment

Also in late 2011, while the Beason-Hammon Act dispute was ongoing, Ficquette learned that Plaintiff was responsible for a default judgment that had been entered against the Department and Commissioner Buckner in a pending lawsuit.  Plaintiff was assigned to handle the suit on August 9, 2011, the date the

Department was served with the complaint.  However, he did not file a responsive pleading or take any other action to defend the Department and Buckner, resulting in the entry of a default judgment against them on October 27, 2011.

Ficquette learned about the default judgment on November 2, 2011.  She discussed the issue with Plaintiff a few days later and instructed him to file a motion to set aside the default.  Plaintiff filed the motion, which ultimately was granted.  In his discussion with Ficquette, Plaintiff explained that he had failed to file a responsive pleading because he had confused the suit with another case involving the same plaintiff.  Ficquette says she did not believe this was a justifiable explanation.  She reprimanded Plaintiff on December 13, 2011 in connection with the default judgment.

Plaintiff responded to the December 13 reprimand by filing a state personnel complaint against Ficquette.  In the complaint, Plaintiff alleged that Ficquette had (1) illegally accused him of insubordination in connection with the Beason-Hammon Act dispute and (2) discriminated and retaliated against him by reprimanding him in connection with the default judgment.[4]  The state personnel board dismissed the complaint for lack of jurisdiction.

---

[4]  Plaintiff later amended his personnel complaint to allege that Ficquette had retaliated against him for participating in the *Rawls* lawsuit.

### E.      Plaintiff's Participation in the *Rawls* Case

#### 1.      Rawls's Deposition

Around the same time Plaintiff was dealing with the Beason-Hammon Act

dispute and the default judgment issue, discovery began in the race discrimination

suit Rawls had filed against the Department.  Retained counsel for the Department

deposed Rawls on December 18, 2011.

Rawls testified at her deposition that Plaintiff had told her he had

"confidential information" that would help her prove Ficquette and Buckner had

discriminated against her.  According to Rawls, Plaintiff had also commented more

generally that he did not believe Rawls had been treated fairly.  Rawls said that

Plaintiff had not provided specific names or given her any of the information he

referenced, but he had implied he would disclose it at the appropriate time.

#### 2.      Plaintiff's First Deposition in *Rawls*

Based on Rawls's testimony, the Department's counsel subpoenaed Plaintiff

to give a deposition in the *Rawls* suit on January 10, 2012.  Plaintiff appeared at

the deposition and gave extensive testimony against the Department.  For example,

Plaintiff testified that the reprimands he and Rawls received in 2009 in connection

with the OCHC unpaid-invoice dispute were racially motivated.  He explained how

certain documents, including criminal history records he had brought to the

deposition, verified this allegation.  And he stated, more pointedly, that he believed Ficquette had intentionally discriminated against him and Rawls.

### 3.   Plaintiff's Production of RAP Sheets

Plaintiff brought eight boxes of Department documents he had gathered from his office to his first deposition in the *Rawls* case.  The deposition was held open by agreement of the parties so that the Department's attorney could review the documents.  During his review, counsel discovered that the documents included unredacted Reports of Arrest and Prosecution ("RAP") sheets that had been collected by OCHC pursuant to the background-check law and that contained social security numbers and other confidential information.  The attorney returned the RAP sheets to the Department.

Sometime in January 2012, Ficquette received the RAP sheets and learned that Plaintiff had produced them at his deposition.  Ficquette was concerned that Plaintiff had produced RAP sheets without advising deposing counsel of their confidential nature.  Presumably based on her review of Plaintiff's deposition testimony, Ficquette also learned that Plaintiff had stored the RAP sheets for years in unlocked storage in his Department office.  According to Ficquette, Plaintiff's maintenance of the RAP sheets in this manner violated federal and state law, as well as Department policy.  Ficquette told Commissioner Buckner that Plaintiff had stored the RAP sheets in his office and produced them at his deposition

without advising the deposing attorney that they were confidential.  Buckner says she agreed with Ficquette that Plaintiff's failure to secure the RAP sheets and maintain their confidentiality violated Department policy.

There is a dispute between the parties about whether Plaintiff's manner of storing RAP sheets violated any law or policy.  Alabama law required RAP sheets to be kept confidential, but did not impose any other specific security requirements.  *See* Ala. Code § 38-13-8.  Tommy Crabtree implemented procedures designed to ensure the confidentiality of RAP sheets in October 2009, including that they be maintained in a "secure, locked file" and that they not be "combined or otherwise mingled" with other records.  But these procedures were not in place when Plaintiff was responsible for collecting the RAP sheets he produced in his deposition in the *Rawls* case.  Defendants have not cited any other policy or law that expressly required RAP sheets to be kept in locked storage, although Ficquette asked for research on the issue in February 2012.  Nevertheless, Plaintiff's disclosure of RAP sheets at his deposition without making <u>any</u> effort to maintain their confidentiality violated Alabama law.  *See id.* (a), (c).

4.    <u>Plaintiff's Use Of A Juvenile Pleading</u>

Around the same time she discovered Plaintiff had produced RAP sheets in the *Rawls* litigation, Ficquette became aware that Plaintiff had also submitted a juvenile pleading as an exhibit in support of his state personnel complaint against

14

Ficquette.  Ficquette claims it was improper for Plaintiff to use the pleading in this manner and that it caused disruption in the office because Plaintiff had impermissibly accessed the work folders of another Department attorney to obtain the pleading.  She advised Buckner about this issue.

### 5.    Plaintiff's February 2012 EEOC Charge

On February 6, 2012, a few weeks after his first deposition in *Rawls*, Plaintiff filed an EEOC charge alleging race discrimination and retaliation. Plaintiff claimed in the charge that Defendants had reprimanded him on December 13 in retaliation for complaining about race discrimination against himself and Rawls and to silence him in his upcoming deposition in *Rawls*.

### 6.    Plaintiff's Second Deposition in *Rawls*

The Department's attorney reconvened and concluded Plaintiff's deposition on February 16, 2012.  At his second deposition, Plaintiff provided additional testimony and documents that supported Rawls's claims.  He also testified that he believed he had been retaliated against and questioned in a threatening manner during his first deposition in order to intimidate him and chill his testimony in *Rawls*.

## F.    Buckner's Investigation

Commissioner Buckner says she developed questions about Plaintiff's conduct in early 2012 as a result of the reports she had received from Ficquette

concerning Plaintiff's production of RAP sheets and misuse of a juvenile pleading, as well as the manner in which he had conducted Rawls's 2009 appraisal.  Buckner gained access to Plaintiff's Department email account and personally reviewed the content of some of his emails.  During her review, Buckner found a message to an individual at a state technical college, sent from Plaintiff's Department account and signed with his professional Deputy AG title, inquiring about having burglar bars installed at Plaintiff's home.

Buckner claims she widened her investigation because she thought the burglar bar email was improper for several reasons, including that it was not job related.  She directed a search of Plaintiff's Department computer using the terms "state personnel board," "Carolyn Rawls," "retaliation," "racial discrimination," and "Ficquette."  Through her expanded search, Buckner discovered that Plaintiff had used his Department computer to prepare pleadings in his personnel complaint against Ficquette.  Plaintiff acknowledges that he used his Department computer and other Department resources to prepare documents in support of his personnel complaint, and that he worked on the complaint during regular work hours and while in his Department office.

### G.    Plaintiff's Termination

#### 1.    The Charge Letter

On March 9, 2012, Buckner advised Plaintiff that she was seeking his

termination on numerous charges, including:

(1)    failing to properly maintain and secure RAP sheets that contained confidential information and producing RAP sheets at his deposition in the *Rawls* case without advising the Department's private attorney that the records needed to be secured and kept confidential;

(2)    breaching confidentiality rules by filing a sealed juvenile pleading in an unrelated public proceeding and failing to seek protection for the document by submitting it under the protective order in the case;

(3)    using his office for personal gain by sending an email from his Department computer with his professional Deputy AG signature requesting installation of burglar bars at his home;

(4)    falsifying Rawls's February 2009 appraisal by failing to note that Rawls had received a written reprimand on February 11, 2009, failing to have the appraisal signed by Ficquette, and failing to submit the appraisal to the Department's personnel office; and

(5)    using his state computer and other Department materials for matters unrelated to his work duties at the Department, including preparation of documents in support of his personnel complaint against Ficquette.

Buckner's charge letter quoted extensively from Plaintiff's first deposition in

*Rawls* in support of the above allegations.

#### 2.    Plaintiff's March 2012 EEOC Charge

A few weeks after he received the above letter, Plaintiff filed another EEOC

charge, dated March 28, 2012.  In this charge, Plaintiff alleged that his proposed

termination was racially motivated and that Defendants also were retaliating against him for opposing discrimination against Rawls and for participating in her race discrimination case.

### 3.   Plaintiff's Termination Hearing

Plaintiff's termination hearing was held on April 4, 2012.  Although he was advised of his right to offer argument and evidence in his defense, Plaintiff chose not to attend.  Pursuant to Department policy, the hearing was conducted by an impartial hearing officer, Mark Williams.  Thereafter, the hearing officer issued a written decision in which he recommended Plaintiff's termination on multiple grounds.

First, the hearing officer found that Plaintiff's termination was warranted because he had falsified records.  This finding was based on Plaintiff's failure to (1) impose the seven-point deduction on Rawls's 2009 appraisal, (2) obtain Ficquette's signature on the appraisal, and (3) submit the appraisal to the Department's personnel office.  The hearing officer found that the deduction was required by Department policy and that Plaintiff, as Rawls's rating supervisor, was responsible for ensuring that it was applied.  The officer concluded that Plaintiff's failure to apply the deduction, and his subsequent failure to process the evaluation through the proper channels, was deceptive and constituted a falsification of records that justified termination under the state personnel rules.

Second, the hearing officer found that Plaintiff's termination was warranted because of his unauthorized use of his Department computer.  The officer noted that Plaintiff had used the computer for personal reasons numerous times, including one time when he sent an email under his professional signature to inquire about getting burglar bars installed at his home and many other times when he used the computer to prepare documents related to his personnel complaint against Ficquette.  He determined that Plaintiff's repeated use of his Department computer for personal reasons violated Department policy and justified termination under the state personnel rules.

Third, the hearing officer found that Plaintiff's termination was warranted because of his improper handling and disclosure of RAP sheets.  The officer credited evidence presented at the hearing that Plaintiff had supervisory authority over the proper maintenance of RAP sheets, and that RAP sheets were required by Department policy to be "kept in a locked file cabinet behind a locked door."  He concluded that Plaintiff had committed a serious violation of personnel rules by failing to keep these documents in a properly secured location and by producing them in the *Rawls* litigation without any effort to maintain their confidentiality.

Finally, the hearing officer concluded that Plaintiff had "exhibited serious mistakes in judgment that disrupted the workplace" at the Department.  As one example of Plaintiff's bad judgment, the officer stated that Plaintiff had "chose[n]

to depart from his role as a key, senior level attorney for [A]DHR and actually opposed [A]DHR's position in sworn testimony and in the transmittal of documents."  According to the officer, the "net effect" of Plaintiff's conduct was disruptive to the workplace and warranted Plaintiff's termination.

### 4.   Plaintiff's Termination

Commissioner Buckner informed Plaintiff in a letter dated April 20, 2012 that the hearing officer had recommended his termination.  Buckner attached a copy of the officer's recommendation and stated that she agreed with it.  Buckner did not specify a particular ground upon which she was relying to support Plaintiff's termination, but she did not reject any of the stated grounds.  Buckner subsequently testified in this litigation that she agreed with the hearing officer's analysis and with his recommendation that each of the cited grounds warranted Plaintiff's termination, and that "collectively they presented an overwhelming case for termination."

### 5.   Plaintiff's Replacement

After Plaintiff's termination, Commissioner Buckner requested that the Attorney General appoint Felicia Brooks to serve as the Deputy AG for the Department.  Brooks is a black female.  She was appointed to the Deputy AG position pursuant to Buckner's request.

6.   Plaintiff's Retirement Benefits

In response to his charge letter and prior to his termination hearing, Plaintiff advised Buckner that he had applied for retirement effective May 1, 2012.  He requested that (1) the April 4th termination hearing be cancelled, (2) he be allowed to remain on paid leave until his retirement, and (3) his personnel file indicate that he was eligible for reemployment.  Commissioner Buckner denied Plaintiff's request.  Although Plaintiff has received retirement benefits since his retirement in May 2012, Buckner's denial of his request to retire in lieu of dismissal resulted in his loss of $26,553.45 in sick leave benefits.[5]

7.   Plaintiff's April 2012 EEOC Charge

After his termination, Plaintiff filed another EEOC charge dated April 27, 2012.  In this charge, Plaintiff alleged that his termination was racially discriminatory and retaliatory and that the conversion of his retirement into a termination resulted in his loss of approximately $25,000 in sick leave benefits.

II.   **Procedural History**

Plaintiff subsequently initiated this lawsuit, asserting race discrimination and retaliation claims against the Department under Title VII, race discrimination and retaliation claims against Buckner and Ficquette individually under §§ 1981 and 1983, and an Alabama state law claim against Buckner and Ficquette, individually

---

[5]  Department employees are paid fifty percent of their accumulated sick leave when they retire. Employees who are dismissed are ineligible for that payment.

21

and in their official capacities.[6]  In support of his claims, Plaintiff alleged he was

reprimanded, disciplined, denied benefits, and ultimately terminated because of his

race and in retaliation for (1) opposing discrimination against Rawls and

participating in the *Rawls* litigation and (2) briefing a state personnel complaint

against Ficquette.

Plaintiff moved for partial summary judgment on his Alabama state law

claim against Buckner.  Defendants moved for summary judgment on all of

Plaintiff's claims.  The case was referred to a magistrate judge, who issued a report

and recommendation ("R&R") recommending that Plaintiff's motion be denied

and that Defendants' motion be granted in full.

Specifically, the magistrate judge concluded that Plaintiff could not recover

on his Alabama state law claim because he was not a classified state employee

when he was terminated.  Alternatively, the magistrate judge concluded that

Plaintiff had not engaged in protected conduct as defined under Alabama law.

As to Plaintiff's federal race discrimination claim, the magistrate judge

found no evidence from which a jury reasonably could infer a racially

---

[6]  Plaintiff also asserted a First Amendment retaliation claim against Buckner and Ficquette.  The magistrate judge concluded that Plaintiff's First Amendment claims failed as a matter of law under a *Pickering* analysis, and that Buckner and Ficquette were entitled to qualified immunity on the claims.  The district court agreed that qualified immunity precluded relief on the First Amendment claims.  Plaintiff does not appeal that ruling.

discriminatory motive for Plaintiff's termination.[7]  Assuming without deciding that Plaintiff had nevertheless established a prima facie case of discrimination, the magistrate judge found that Plaintiff had failed to present any evidence to rebut the Department's explanation that Plaintiff was terminated not because of his race but because he violated work rules, particularly rules requiring that RAP sheets be treated as confidential information.  According to the magistrate judge, Plaintiff's conduct with regard to the RAP sheets indisputably was a terminable offense.

Addressing Plaintiff's retaliation claim, the magistrate judge rejected Plaintiff's argument that he had produced direct evidence of retaliation and applied the *McDonnell Douglas* burden-shifting framework.  The magistrate judge assumed without deciding that Plaintiff had raised a prima facie case of retaliation. Nevertheless, the magistrate judge determined that it was undisputed that the Department had terminated Plaintiff for non-retaliatory reasons, including (1) his failure to properly maintain the RAP sheets in accordance with Department policy and Alabama law and (2) disloyalty to the Department that was inconsistent with Plaintiff's continued legal representation of the agency.  As such, the magistrate judge concluded that Plaintiff could not prevail on his retaliation claim.

---

[7]  The magistrate judge concluded that Plaintiff had abandoned his race discrimination and retaliation claims to the extent those claims relied on any adverse action other than his termination.  The district court agreed with that conclusion.  Plaintiff does not raise it as an issue on appeal.

The district court adopted the magistrate judge's R&R recommending summary judgment as to all claims, except that the court did not agree that summary judgment should be granted on the state law claim. The district court agreed with the magistrate judge's reasoning as to the race discrimination and retaliation claims, and granted summary judgment to Defendants on those claims. Having granted judgment on all of Plaintiff's federal claims, the district court determined it should decline to exercise jurisdiction over the remaining state claim. The court thus dismissed the state claim without prejudice to permit its refiling in state court.

## DISCUSSION

### I.   Standard of Review

We review the district court's summary judgment ruling de novo, construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). We apply the same standard as the district court. *Id.* Summary judgment is only appropriate if there are no genuine issues of material fact and Defendants are "entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted).

## II.   <u>Plaintiff's Retaliation Claim</u>

Title VII prohibits an employer from retaliating against an employee because he "has opposed any practice made an unlawful employment practice" by Title VII or because he "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[8]  42 U.S.C. § 2000e-3(a).  To prevail on a Title VII retaliation claim, an employee must prove that (1) he engaged in conduct protected by the retaliation provision, (2) he suffered a materially adverse employment action, and (3) there was a causal relationship between the two.  *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012).  The relationship required by the third prong is "but-for" causation.  *Univ. of Texas SW Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2534 (2013).  That is, the employee must show that he would not have suffered the adverse action if he had not engaged in the protected conduct.  *Id.* at 2533.

Testifying in a Title VII proceeding constitutes participation protected against retaliation under 42 U.S.C. § 2000e-3(a).  Plaintiff thus engaged in protected conduct when he testified in the *Rawls* case in January and February of

---

[8]  Title VII and § 1981 "have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).  *See also Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (noting that a retaliation claim has the same elements whether it arises under Title VII or § 1981).  Thus, we analyze Plaintiff's Title VII claim with the understanding that our analysis applies to his § 1981 claim as well.

2012.[9]  *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997)

("Under the plain language of the [participation clause], those who testify or

otherwise participate in a Title VII proceeding are protected from retaliation for

having done so.").  Plaintiff suffered a materially adverse action when his

employment was terminated in April 2012, a few months after his second

deposition in *Rawls*.  The determinative question for this appeal is whether

Plaintiff has presented evidence sufficient to allow a jury to determine that his

testimony in *Rawls* was a "but-for" cause of his termination.  *See Nassar*, 133 S.

Ct. at 2534.  We hold that he has produced sufficient evidence to withstand

Defendants' motion for summary judgment.

A plaintiff may rely on direct or circumstantial evidence to show that an

adverse action was retaliatory.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079,

1085 (11th Cir. 2004).  Direct evidence is "evidence, which if believed, proves"

retaliation "without inference or presumption."  *Merritt*, 120 F.3d at 1189

(quotation marks omitted).  For example, we have characterized the following

statement as direct evidence of retaliation:  "[Y]our deposition was the most

damning to [the company's] case, and you no longer have a place here at [the

---

[9]  Plaintiff also arguably engaged in conduct protected by the opposition clause during the
deposition and at various other times during his employment.  We limit our discussion to his
conduct under the participation clause because its protection is more expansive than that of the
opposition clause.  *See E.E.O.C. v. Total Sys. Servs. Inc.*, 221 F.3d 1171, 1175–1176 (11th Cir.
2000) (discussing the "two different levels of protection" offered by the participation and
opposition clauses).

company]." *Id.* at 1190.  Summary judgment is not appropriate if the plaintiff has presented direct evidence.  *Id.* at 1189.

When a plaintiff relies only on circumstantial evidence, we generally apply the *McDonnell Douglas* burden-shifting framework to determine whether his claim should survive a motion for summary judgment.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).  Under that framework, the plaintiff must first establish a prima facie case that an adverse action was retaliatory.  *Id.*  The burden then shifts back to the employer to articulate a legitimate, non-retaliatory reason for the adverse action, which the plaintiff has an opportunity to rebut with evidence of pretext.  *Id.* at 1181–1182.  Although we often find it to be useful, we have recognized that the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence.  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005).  A plaintiff's claim will also survive summary judgment if he otherwise presents "enough circumstantial evidence to raise a reasonable inference" that an adverse action was taken against him in violation of Title VII. *Hamilton*, 680 F.3d at 1320.

The evidence in this case is sufficient to at least raise the inference. Commissioner Buckner began the investigation that led to Plaintiff's termination within a month of Plaintiff's first deposition in *Rawls*, and just prior to his second

deposition.  During the investigation, Buckner searched Plaintiff's Department computer using the search terms "Carolyn Rawls," "Retaliation," "Racial Discrimination," and "Ficquette."  A reasonable jury could infer from the timing and the focus of the investigation that it was prompted by Plaintiff's testimony that Ficquette had discriminated against Rawls, and not just by the discovery of facts during Plaintiff's deposition suggesting that he had engaged in other misconduct, such as improperly storing and producing RAP sheets or failing to follow protocol with respect to Rawls's 2009 appraisal.

A few weeks after Plaintiff's second deposition in *Rawls*, Buckner sent him a charge letter advising him that she was seeking his termination.  The hearing officer subsequently held a hearing and issued a written decision recommending Plaintiff's termination on multiple grounds, including "disruptive conduct" in the workplace.  As an example of disruptive conduct, the hearing officer stated that Plaintiff had "actually opposed [A]DHR's position in sworn testimony."  In several other statements made in support of the disruptive conduct ground, the hearing officer suggested[10] that Plaintiff acted improperly by assisting Rawls in her race discrimination case and opposing the Department in litigation.  This officer was not the decision-maker.  That role fell to Commissioner Buckner, but she accepted

---

[10]  The parties dispute whether the hearing officer's statements constitute direct evidence of retaliation.  We do not need to resolve the dispute to decide this appeal.  Regardless of how it is characterized, the evidence is sufficient to raise a triable issue of fact as to whether Plaintiff's testimony in *Rawls* was a but-for cause of his termination.

the hearing officer's recommendation in full and without modification.  She also testified in this litigation that she believed Plaintiff had been disloyal by "get[ting] involved" in Rawls's case against the Department.  Based on all of this evidence, a jury reasonably could infer that Plaintiff would not have been terminated but for his deposition testimony in *Rawls.*

In fact, the magistrate judge seemed to accept that Plaintiff was fired, in part, because of his participation in *Rawls.*  He nevertheless recommended granting summary judgment on Plaintiff's retaliation claim, suggesting that Plaintiff's position as a Department attorney, and his corresponding duty of loyalty, rendered his participation in *Rawls* a terminable offense.  There is no authority to support such a limitation on the scope of Title VII's retaliation provision under the facts of this case.  Plaintiff did not represent the Department in the *Rawls* matter.  His testimony during a deposition in that litigation, as a fact witness and pursuant to a subpoena, falls within the plain language of the participation clause and, under our controlling precedent, was not a proper ground for his termination.  *See Merritt,* 120 F.3d at 1189.

The magistrate judge also indicated that summary judgment was warranted by evidence showing Plaintiff was terminated for legitimate reasons, particularly his improper maintenance and disclosure of RAP sheets.  We agree with the magistrate judge that the Department can legitimately fire an employee for various

types of workplace misconduct, including improper maintenance of RAP sheets,

insubordination as reflected by the employee's handling of the appraisal of an

employee under his supervision, and unauthorized use of the employee's

Department computer for personal matters.  But we do not find the record evidence

here sufficient to establish, as a matter of law, that Defendants did fire Plaintiff for

these legitimate reasons.  As discussed, there is conflicting evidence as to whether

Plaintiff violated any law or policy in his manner of storing RAP sheets.

Moreover, there is evidence suggesting that Plaintiff's termination was at least

partially motivated by his protected deposition testimony in *Rawls.*  Accordingly, it

is for the jury to decide whether, notwithstanding the RAP sheet issue and other

alleged misconduct, Plaintiff's testimony in *Rawls* was the "but-for" cause of his

termination.

## III.   <u>Plaintiff's Race Discrimination Claims</u>

Title VII prohibits employment discrimination on the basis of race, color,

religion, sex, or national origin.  42 U.S.C. § 2000e–2(a)(1).  Like retaliation,

discrimination in violation of Title VII may be proven either by direct or

circumstantial evidence.  *Crawford v. Carroll*, 529 F.3d 961, 975-976 (11th Cir.

2008).  Again, when a claim is based on circumstantial evidence, we generally

apply the burden-shifting *McDonnell Douglas* framework.  *See Vessels*, 408 F.3d

at 767.  But we recognize that a plaintiff's claim will survive summary judgment if

he otherwise presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton*, 680 F.3d at 1320.

Plaintiff relied only on circumstantial evidence to support his race discrimination claim, and the magistrate judge analyzed the claim under the *McDonnell Douglas* framework.  Assuming Plaintiff had established a prima facie case, the magistrate judge concluded his race discrimination claim could not survive summary judgment because the evidence conclusively showed that Defendants had fired Plaintiff for a legitimate, non-discriminatory reason and Plaintiff failed to present any evidence of pretext.  Finding no evidence from which a jury reasonably could conclude that Plaintiff's termination was racially motivated, the magistrate judge recommended granting summary judgment on the claim.

Plaintiff designated his race discrimination claim as an issue for appeal, but he did not cite any evidence or authorities in support of the claim in his appellate brief.  Instead, he merely stated that he had "presented ample circumstantial evidence of discrimination" below.  This conclusory statement was insufficient to preserve Plaintiff's race discrimination claim for appeal.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.");

*Hamilton*, 680 F.3d at 1319 ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."). Plaintiff has abandoned his race discrimination claim by failing to cite any evidence or authority in support of it.

In any event, we agree with the magistrate judge's conclusion that Defendants are entitled to summary judgment on Plaintiff's race discrimination claim. Applying the *McDonnell Douglas* framework, a plaintiff may establish a prima facie case of race discrimination with evidence that (1) he belongs to a protected class, (2) he was subjected to an adverse employment action, (3) his employer treated similarly situated employees outside of his classification more favorably, and (4) he was qualified to do the job. *See Wilson*, 376 F.3d at 1091. Plaintiff's protected class is his race, and the adverse action at issue is his termination. Plaintiff does not cite evidence in his appellate brief to suggest that he was treated less favorably than any employee of a different race with respect to his termination.[11] And it is undisputed that, after being terminated, Plaintiff was replaced in the Deputy AG position by a black female, pursuant to Buckner's request.

Even assuming, as did the magistrate judge, that Plaintiff could establish a prima facie case, he has not presented any evidence that the reasons asserted for his

---

[11]  The white employees referred to in Plaintiff's summary judgment brief below were not similarly situated to him either in their job duties or in their alleged misconduct.

termination were a pretext for race discrimination.  As discussed, there is evidence from which a jury could infer that Plaintiff was terminated in retaliation for his deposition testimony in *Rawls*, and not because of his multiple acts of misconduct. There is, however, no evidence to suggest that Plaintiff's termination was racially motivated.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's federal race discrimination claim.

**IV.**   **Plaintiff's State ASEPA Claim**

After granting summary judgment on all of Plaintiff's federal claims, the district court declined to exercise jurisdiction over Plaintiff's remaining state law claim.  Given our decision reversing and remanding Plaintiff's federal retaliation claim, we also remand the state law claim because the district court's reason for declining jurisdiction over the claim is no longer valid.

## CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's order granting summary judgment to Defendants on Plaintiff's race discrimination claim under Title VII and § 1981.  We **REVERSE** the district court's order granting summary judgment to Defendants on Plaintiff's retaliation claim under Title VII and § 1981 and **REMAND** that claim for proceedings consistent with this opinion. We also **REMAND** Plaintiff's state law claim.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 31, 2016

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-10856-EE
Case Style: James Long v. Alabama Department of Human Re, et al
District Court Docket No: 2:13-cv-00176-MHT-PWG

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF")
system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal.
Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in
accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for
rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings,
a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time
specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a
motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list
of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-
1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition
for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time
spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a
petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature
block below. For all other questions, please call Sandra Brasselmon, EE at (404) 335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs